**DOCTORS HOSPITAL, INC., Plaintiff,**

v.

**Joseph A. CALIFANO, Jr., Defendant.**

**Civ. A. No. 77–1908.**

United States District Court,
District of Columbia.

Oct. 6, 1978.

---

George H. Clark, Gordon H. Glenn, Washington, D. C., for plaintiff.

Nathan Dodell, Asst. U. S. Atty., David B. Palmer, HEW, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GESELL, District Judge.

This case involves several issues relating to the reimbursement of a provider of Medicare services. Plaintiff is Doctors Hospital, Inc., which owns and operates Doctors Hospital located in the District of Columbia. Plaintiff is a wholly-owned subsidiary of Washington Medical Center, Inc. ("WMC") and is an authorized "provider of services"

for Medicare purposes. Defendant is Joseph A. Califano, Jr., Secretary of the United States Department of Health, Education, and Welfare.

The cost items in dispute here involve the two fiscal years ending December 31, 1973, and December 31, 1974. All but one of the items were found to be non-reimbursable by Group Hospitalization, Inc. ("GHI"), plaintiff's "fiscal intermediary." An appeal was taken to the Provider Reimbursement Review Board (the "Board") and hearings were held on the cost items now in contention and on other issues. The Board issued its decision on July 8, 1977, affirming GHI in some respects and reversing it on others. On September 9, 1977, the Administrator of the Health Care Financing Administration (the "administrator") affirmed the Board's decision in all respects. Plaintiff then brought this action to review the agency's determinations. The Court is presented with cross-motions for summary judgment, there being no material issues in dispute. The facts relating to each cost item are discussed in the course of the following opinion.

## I.

The Health Insurance for the Aged Act ("Medicare Act"), 42 U.S.C. § 1395–1395pp (1976), establishes two regimes of federal medical care support for the aged and certain disabled persons. Part A of the Act provides for the reimbursement of inpatient hospital services and certain services rendered following inpatient hospital care. 42 U.S.C. §§ 1395c–1395i–2 (1976). Part A Medicare beneficiaries generally receive hospital and related care services at no charge; the providers of the services then receive direct reimbursement from the Government (through so-called "fiscal intermediaries"). Part B of the Act establishes a voluntary medical insurance program which pays for various health services not covered by Part A of the Act, such as physician services and certain laboratory fees. 42 U.S.C. §§ 1395j–1395w (1976). Part B is partially financed by premiums paid by its enrollees. 42 U.S.C. § 1395s

(1976). This suit involves Part A reimbursement.

Reimbursement of providers differs as between Part A and Part B. Under Part B, reimbursement is premised on the "reasonable charges" of the individual or entity providing the services, although in some instances a provider may receive Part B reimbursement based on 80% of its reasonable costs. 42 U.S.C. § 1395l (1976). Part A reimbursement, on the other hand, is based upon the lesser of the provider's "reasonable cost" in rendering such services or its "customary charges" with respect to such services. 42 U.S.C. § 1395f(b) (1976). "Reasonable cost" for purposes of the Act is defined in 42 U.S.C. § 1395x(v)(1)(A) (1976):

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations . . . . Such regulations shall (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

Pursuant to this authorization, the Secretary of Health, Education, and Welfare has promulgated regulations governing the reimbursement of providers under the Act. See 42 C.F.R. §§ 405.401–405.488 (1977).

Medicare reimbursement is commonly accomplished through the use of so-called "intermediaries." See 42 U.S.C. §§ 1395h, 1395u. The "intermediary" in this case is

the Blue Cross Association which has delegated its duties to Group Hospitalization, Inc. ("GHI"), a District of Columbia corporation.

At the close of each fiscal year, providers of services submit "cost reports" to their respective "intermediaries." 42 C.F.R. § 405.406(b). After an audit of a provider's report, the intermediary determines the "reasonable cost" of the reimbursable services which have been provided, and hence the reimbursement due. *See* 42 C.F.R. § 405.454(f).

When a provider such as plaintiff disagrees with the intermediary's "reasonable cost" determination, it may obtain a hearing before the Provider Reimbursement Review Board (the "Board"). 42 U.S.C. § 1395 oo (1976); 42 C.F.R. § 405.1835. The Board, basing its decision "upon the record made at such hearing," is authorized to "affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination." 42 U.S.C. § 1395oo (d) (1976). Decisions of the Board constitute the Secretary of HEW's final decision, unless within 60 days of the provider receiving notice of the Board's decision, the Secretary reverses, affirms or modifies the Board's decision on his own motion. 42 U.S.C. § 1395oo (f)(1) (1976). The Secretary has delegated his powers in this regard to the Administrator of the Health Care Financing Administration (the "Administrator").

Judicial review may be obtained of the Board's decision or of the Secretary's decision, whichever is final. 42 U.S.C. § 1395oo(f)(1). Both parties agree that the Board's action in this case, as affirmed by the Administrator, may be overturned by the Court if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 5 U.S.C. § 706(2)(A) (1976); or was "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E) (1976).

The Court may not affirm the Board's decision based on any *post hoc* rationalizations advanced by government counsel. The Court must look solely at the decision of the Board which itself has to "be supported by substantial evidence when the record is viewed as a whole." 42 U.S.C. § 1395oo(d) (1976). Balanced against this, however, is the fact that both Medicare regulations and judicial authority place the burden of proof of "reasonable cost" on the provider. 42 C.F.R. § 405.453. *See e. g., Overlook Nursing Home, Inc. v. United States*, 556 F.2d 500, 506 (Ct. Cl. 1977).

For purposes of judicial review, "substantial evidence" means something less than the weight of the evidence. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). It amounts to such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached. *Id.*, at 620, 86 S.Ct. 1018, 1027. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's decision from being supported by substantial evidence. *Id.* This standard is intended to free "the reviewing courts of the time-consuming and difficult task of weighing the evidence," to give "proper respect to the expertise of the administrative tribunal" and to help "promote the uniform application of the statute." *Id.*

## II.

### A. *Accrued, but unpaid, compensation*

For the 1973 and 1974 fiscal years, plaintiff's cost reports sought reimbursement for two accrued, but unpaid, liabilities. One was compensation plaintiff owed Dr. John Andrina for services he had performed in supervising plaintiff's oxygen inhalation therapy department. The other was a debt plaintiff owed Oscar B. Hunter Memorial Laboratories ("Hunter Lab") for physical examinations it had performed on plaintiff's and WMC's employees. These obligations were accrued on plaintiff's books, but were still unpaid as of more than a year

following the close of the the relevant fiscal periods (and remained unpaid until at least early 1976).

The fiscal intermediary disallowed the costs on the basis that they represented either contingent liabilities or costs involving related party considerations, but did indicate that they might be recognized upon their actual payment. The Board affirmed, ruling that:

[S]ince these amounts had not been actually paid within a reasonable time (more than a year) after the end of the relevant fiscal periods, the Intermediary's disallowances of those amounts are affirmed.

. . .

However, if these amounts are paid in a subsequent fiscal period, consideration as to allowability would need to be made at the time of audit of the cost reports for that period and consideration given to whether the amounts represent the costs to a related person or organization.

With respect to the question whether the Pathology Laboratory and the Provider are related organizations, the Board points out that if the evidence indicates that they are related, the burden of proof rests on the Provider to show that it meets *all four* of the criteria for exception stated in Regulation § 405.427(d), if charges instead of costs are to be allowed. The Provider has provided no evidence that it meets any of those criteria. The Intermediary's disallowances are affirmed.[1]

The Medicare regulations require that reimbursement be based on the accrual method of accounting. 42 C.F.R. § 405.453(a). As stated by the regulations, "expenses are reported in the period in which they are incurred, regardless of when they are paid." 42 C.F.R. § 405.453(b)(2). This regulation would appear squarely to support plaintiff's position.

Defendant, however, notes that the Blue Cross' accounting expert testified before the Board that generally accepted accounting principles require that accrual of an obligation be supported by payment "within a reasonable period of time." "Payment" for this purpose would have even included the execution of promissory notes. Defendant's expert acknowledged, however, that, until these items in dispute, he had never found it necessary (in the many years he had conducted Blue Cross contract audits in the D.C. area) to eliminate an accrual for the reason of greatly delayed payment.

■ The Court finds that the Board's decision is inconsistent with 42 C.F.R. § 405.453(b)(2). The Board presented no legal or factual reason why disallowance of these costs can be harmonized with this regulation. Its decision in this regard must, therefore, be reversed. In reaching this conclusion, the Court has considered the recent promulgation of an amendment to HIM-15, the Provider Reimbursement Manual promulgated by HEW. New sections 2305 and 2305.1 provide that short-term liabilities must be liquidated through payment within a year following the reporting period of their accrual unless the provider establishes that it is entitled to an exception. The amendment's Transmittal Letter stated that these sections introduced "a new policy on the time limit for the liquidation of short term liabilities" and noted that the new policy would be effective only for cost reporting periods after April 1, 1978.

In the event the defendant wishes to pursue the related-party issue further, it may do so before the Board. The Court notes that considerable time has passed since the accrual of these obligations and views this as an appropriate area for agreement between the parties.

B. *Interest on MHC note*

Plaintiff currently operates a hospital facility entitled under District of Columbia

1. The Government in its memorandum of points and authorities incorrectly characterizes the Board's decision. The Board disallowed these costs because actual payments had not occurred within a reasonable time. The effect, if any, which related party considerations might have on the allowance of these costs was left to such later time as actual payments were made. The Board did not, at any point in its opinion, characterize the liabilities as not constituting "fixed liabilities."

law to hold 321 beds. For various reasons,[2] plaintiff decided in 1972 that it would replace its existing hospital facility with a new and larger facility. To be able to construct a larger hospital, plaintiff entered into an agreement on November 28, 1973, with Metropolitan Hospital Center, Inc. ("MHC") whereby plaintiff purchased from MHC all rights to a "certificate of need" for 190 beds. Possession of this certificate assured plaintiff of the permission it needed from the District of Columbia Government to construct a 385-bed hospital (*i. e.*, one with 64 more beds than are held by plaintiff's present facility). The agreement with MHC provided that half of the purchase price would be paid at the conclusion of five years. This obligation was represented by plaintiff's 8% promissory note.

Plaintiff incurred $13,111 interest on this note during the fiscal year ended December 31, 1974. Treating this as a current expense, it included the interest in its cost report for that year.

The Intermediary disallowed the cost as not reasonably related to current patient care. The Intermediary decided instead that the interest should be treated as a capital cost of the new facility and not recognized, if at all, until the construction of the new hospital. The Board affirmed the fiscal intermediary's decision:

> [T]he Board does not believe that the acquisition [of the "certificate of need"] relates to the delivery of patient care as it pertains to the cost reporting periods in dispute. It may relate to patient care activities delivered at some other building in the future but the expense is not currently related to the patient care activities of the Provider. The monies may be used to construct some other building in the future but no one knows whether it will be operated by the Provider. The Board agrees with the Intermediary that these costs should be capitalized and recognized in allowable costs to the extent of Medicare utilization of a new facility

when it is opened. The Board does not agree with the Provider's contention that it has the option under Medicare accounting principles to either capitalize or expense the item currently. The Board has found that this expense does not relate currently to the patient care activities of the Provider, and thus, the interest on the MC loan is not an allowable cost.

■ The Board's decision conforms to the relevant statutory and regulatory provisions, is not arbitrary or irrational, and is supported by substantial evidence. 42 U.S.C. § 1395x(v)(1)(A) mandates that "the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs . . ." be carried by Medicare. The Board's interpretation of this as requiring that the costs pertain "to the cost reporting periods in dispute" makes eminent sense. Medicare utilization of a particular facility can undergo marked variation over the period of just a few years. Even small changes in utilization impact substantially on reimbursement. A hospital could, in fact, decide at some point to leave the Medicare program altogether. If costs relating to the care of patients in the post-change period had been charged to Medicare during an earlier period—based on the Medicare utilization of the facility during the earlier period—Medicare would have borne costs not properly its responsibility.

Several regulatory provisions also support the Board's requirement that costs relate to "current" patient care. In describing the general principles which must govern reimbursement, 42 C.F.R. § 405.451(b)(3) states that the "determination of reasonable cost of services must be based on cost related to the care of beneficiaries of . . . the Act." The regulations implement this general rule by measuring the Medicare utilization of a particular service as compared to the non-Medicare use of that service, so that "the share borne by the program is based upon actual services *received* by pro-

---

**2.** *Several considerations may have led plaintiff to the decision it took in 1972. These reasons included the age and deteriorated physical condition of its hospital facility, and the likelihood* of a favorable refinancing of its heavy debt load were it willing to replace, instead of repair, its hospital.

gram beneficiaries." 42 C.F.R. § 405.452(b). (Emphasis supplied). Finally, 42 C.F.R. § 405.454(f)(1) requires that each year's retroactive adjustment bringing earlier estimated payments to a provider into conformity with the actual reimbursement due, be based on ". . . the reimbursable amount payable to the provider for the services rendered to program beneficiaries *during that period.*" (Emphasis supplied). Reimbursement for costs relating to a future period of time (when the facility's Medicare utilization might be different) would be inconsistent with these regulations.

Substantial evidence supports the Board's conclusion that the interest on the MHC note related to the construction of a new *and expanded* facility rather than to the care plaintiff provided Medicare patients during its 1974 fiscal year. Plaintiff's purchase of the certificate of need was not a prerequisite to the replacement of its present facility. Rather, it was needed to permit plaintiff to build a larger facility. This fact effectively answers plaintiff's claim that construction of a new facility was required to maintain its accreditation in 1974. Furthermore, plaintiff cannot be said to have proved its claim that a new facility was the only way to maintain its accreditation in 1974. Plaintiff presented no evidence—such as engineers' reports, architects' reports, or government opinions—to the effect that the needed upgrading of its existing facility was either impossible or economically infeasible. The conclusory statement of WMC's president to the effect that the purchase of the certificate of need permitted the continuation of plaintiff's accreditation does not suffice.

Plaintiff will not necessarily forego all reimbursement for this interest. It will be reimbursed to the extent that the asset financed by the loan is used to benefit Medicare patients.

Plaintiff points out that generally accepted accounting principles permit plaintiff to treat the MHC note's interest as a current expense. Accounting principles, however, also allow such interest to be capitalized.

Thus, plaintiff's reliance on 42 C.F.R. § 405.406(a) is misplaced. That regulation states that, as a general rule, standardized accounting practices are to be followed for Medicare reimbursement purposes. *Saint Francis Memorial Hospital v. Weinberger*, 413 F.Supp. 323, 332–34 (N.D.Cal.1976), is not to the contrary. That case involved a challenge to a new HEW Manual Medicare rule that construction interest be capitalized. The court struck down application of the rule to the years before it because—as a rule working a change in the prior law—due process barred its retroactive application. The court did "not question the reasonableness of the Secretary . . . in finding that the requirement . . . that interest during construction be capitalized aids in implementing the principles underlying both the Medicare Act and its regulations." *Id.,* at 334.

### C. *Loss on the disposal of certain depreciable assets*

Plaintiff seeks reimbursement for a loss in claims it incurred as the result of the voluntary demolition of two of its buildings. The genesis of this claim was an agreement WMC entered into on May 9, 1974, with Square 106 Associates ("Associates"), whereby WMC conveyed to Associates a 99-year ground lease in WMC's property located on Square 106 in the District of Columbia. The property involved included the 1812 K Street Building, the Wilsonia Apartments, the Columbia Medical Building, the Columbia Medical Building Annex and plaintiff's hospital building. In accordance with the agreement, Associates demolished the 1812 K Street and Wilsonia Apartment buildings in mid-1974. The hospital building itself is scheduled to be turned over and razed sometime between May of 1979 and May of 1980.

In May 1974, plaintiff's books reflected that the two buildings in question still possessed significant remaining useful lives. Plaintiff had chosen ten-year estimated useful lives over which to depreciate both assets. As of January 1, 1974, plaintiff had depreciated less than 50% of the book value

of the 1812 K Street Building (acquired in June 1969; improved in February 1972) and less than 65% of the book value of the Wilsonia Apartments. Plaintiff did not provide the Board with any engineering, architectural, or similar evidence demonstrating that the actual remaining useful lives of either of the buildings had neared exhaustion in May 1974.

WMC apparently garnered a substantial profit from the 99-year ground lease arrangement. In spite of this, plaintiff contends that its loss in May 1974 of the two buildings' undepreciated book values ought to be recompensed by Medicare.

The intermediary recognized as reimbursable in May 1974 the undepreciated book values of the two buildings. The Board reversed this determination, finding that:

> The Board is mindful that the same question will arise in a subsequent year when the hospital itself is demolished.
>
> .    .    .    .    .
>
> The Provider voluntarily permitted these buildings to be demolished because by so doing it was able to increase the value of the land by a greater amount than the reduction in book value of the buildings which occurred when they were demolished. To regard such a transaction as a loss for which the Medicare program should pay seems inequitable.
>
> The apparent basis for recognizing a loss arises from the separation under Medicare principles of the reimbursement for land from reimbursement for depreciable assets including buildings. Gain or loss on land is not recognized whereas that on buildings is recognized through a revision of the useful life used for depreciation. Such a separation of treatment may well be justified in most cases but where the value of land and the value of buildings on the land are mutually interdependent, as in this case, it may well be said that no loss on the buildings occurred. In fact, the Provider had at least as much value *after* the buildings were demolished as the net book value *before* the demolition. .    .    . [R]ealistically a 99-year lease has so many of the economic conse-

quences of a sale that it should be viewed as such for present purposes.

Depreciation is recognized by the Medicare program as an appropriate component of the "reasonable cost" of providing services to Medicare patients. *See* 42 C.F.R. § 405.402(c) & (d). For depreciation purposes, Medicare prorates the historical cost—less estimated salvage value—of a depreciable asset over its predicted useful life. 42 C.F.R. § 405.415. Land is not a depreciable asset under generally accepted accounting principles or for the purpose of Medicare reimbursement. *See* HIM-15, § 104.6. Buildings of the sort at issue here however are depreciable assets.

Gains or losses incurred with respect to depreciable assets are recognized for reimbursement purposes by 42 C.F.R. § 405.-415(f), which states:

> Gains and losses realized from the disposal of depreciable assets while a provider is participating in the program .    .    . are to be included in the determination of allowable cost.

Gains or losses on non-depreciable assets—such as land—are not recognized for Medicare reimbursement purposes.

The Board's apparent rationale for disallowing the loss claimed here was that the buildings' destruction increased the underlying land's value by more than the buildings were worth. The record before the Board does not *directly* support this factual conclusion. The record in fact supports the plaintiff's contention that little or no part of the ground lease's price was attributable to the two buildings in question; the parties' intent was that they would be razed. Moreover, as plaintiff correctly points out, gain or loss on the disposition of land is not a factor to be considered for Medicare reimbursement purposes.

■ The Board's decision, however, can in two ways be harmonized with the statute and pertinent regulations. One reasonable interpretation of the Board's decision is that—after looking at the economic realities of the transaction in question—it found that plaintiff could not have suffered a net

actual loss with respect to these buildings; or, at least, that plaintiff did not meet its burden of proving that it had. Medicare reimbursement may never exceed the provider's "actual costs" of providing Medicare services. 42 C.F.R. §§ 405.402(a); 405.-451(c)(2). Plaintiff's books reflected that the two buildings in question still possessed significant remaining useful lives as of May 1974. The natural inference to be drawn from this fact was that the buildings then still had significant actual remaining useful lives. Plaintiff did not submit any probative evidence to negate this inference. Under these circumstances, the Board could have reasonably concluded that the buildings' destruction meant the loss of some positive actual value.[3] As a rational economic entity acting voluntarily, WMC must, therefore, have received some consideration which more than offset this loss. The transaction was framed in such a way that the entire consideration was attached to the ground lease. The Board, however, must have surmised that the ground lease price was comprised of two components: consideration for lease of the land itself (i. e., without provision for the destruction of any buildings) and consideration for lease of the space above the land (i. e., including provision for the destruction of the existent buildings). The second component may theoretically be a non-depreciable asset; yet, in May 1974, it and the two buildings—depreciable assets—were inextricably mingled. Economic sense would compare the value of this second component with the loss of the buildings' book value. Only then could the existence of a net gain or loss be discovered. The Board therefore did not act arbitrarily or capriciously in finding that no "loss" had eventuated because the provider had supplied it with no evidence rebutting the likely economic reality.

■ Also implicit in the Board's decision was the legal conclusion that 42 C.F.R. § 405.415(f) could not have been drafted with this situation in mind. As stated by the Board, "Gain or loss . . . on buildings is recognized through a revision of the useful life used for depreciation." The Board may, therefore, have believed that, if the useful life of a depreciable asset needs no revision, no gain or loss may be recognized. This interpretation of § 405.415(f) finds support in the regulation's own terms. Gain or loss is permitted to enter into a Medicare reimbursement calculation only in the proportion by which the number of years a facility has been used for Medicare purposes compares to that facility's total life. The implication is that such a facility has been "used up" faster than originally anticipated, thus requiring a retroactive adjustment in its originally projected useful life. This adjustment, though, makes sense only if demolition actually reflects an end to real useful life. See also HIM-15, § 132.1; 42 C.F.R. § 405.417(b) (a related gain or loss provision). The regulation thus could not have contemplated the situation where demolition does not reflect an end to useful life; and the facts demonstrate that the losses of book value in question here could not rationally be attributed to the two buildings' actual "exhaustion" in the provision of medical services. Furthermore, as noted earlier, Medicare reimbursement cannot exceed the "actual costs" a provider incurs in the provision of medical services to Medicare beneficiaries.

Carried to its logical extreme, plaintiff's position would shoulder Medicare with the entire cost of a medical facility (useful in that capacity for twenty years) which is constructed in one year and destroyed the next (because a far more profitable use of the underlying land has appeared). The Board did not, and the Court will not, allow 42 C.F.R. § 405.415(f) to be interpreted in such an inequitable manner.

D. *Legal fees in connection with stockholders' derivative suit*

Plaintiff incurred legal fees during 1974 in the defense of a stockholders' derivative

---

**3.** The fact that the buildings made up little or no part of the ground lease's price is not inconsistent with this conclusion. The lessee intended to destroy these buildings. Naturally, the buildings—from the lessee's perspective—were of little value. As a matter of fact, they may have had negative value to the lessee; their destruction had to have cost something.

suit. The lawsuit sought injunctive relief against the plaintiff corporation and several individual defendants and damages against the individual defendants. The complaint alleged antitrust and securities violations, conflicts of interest, self-dealing and various breaches of fiduciary duties.[4] In many respects, the suit was simply a fight between the two major stockholders of WMC, Dr. Morris on the plaintiffs' side, and Dr. Hunter on the defendants'. The action was ultimately settled out of court. Under the settlement, shares of WMC's two largest stockholders were placed in a voting trust.

The fiscal intermediary disallowed reimbursement for these legal fees on the basis that they represented stock or corporate maintenance costs not allowable under HIM-15, § 2134.9. That provision states:

> The following types of costs relevant to the proprietary and equity interests of the stockholders, but not related to patient care, are excluded from allowable costs: costs incurred primarily for the benefit of stockholders or other investors, including, but not limited to, the cost of stockholders' annual reports and newsletters, annual meetings, mailing of proxies, stock transfer agent fees, stock exchange registration fees, stockbroker and investment analysis, and accounting and legal

fees for consolidating statements for SEC purposes.

The Board affirmed the disallowance of these costs (with respect to the derivative suit at issue here and another one not before the Court). The Board gave the following reasons:

> [T]he legal fees paid in defense of the shareholder's actions against the PC were for corporate maintenance. The matters surrounding the law suits were attempts by the shareholder to protect his investment in the corporation. The Board believes that such matters do not relate to the delivery of efficient health care in the institution but relate to shareholder matters. Testimony elicited at the hearing demonstrated that both suits were initiated by the same shareholder. The first suit appeared to be an attempt on the part of the shareholder to protect his investment in the corporation and the second suit challenged the legality of the lease that was entered into with the "Square XYZ Associates." Also, it challenged the wisdom as well as the authority of the corporation to dispose of assets through a lease without the approval of the shareholders. Again, it seems clear to this Board that these suits relate to shareholder matters and should be con-

---

4. More specifically, the complaint claimed: (1) self-dealing and breaches of fiduciary duty by the individual defendant Hunter and others in their helping perpetuate unreasonable, noncompetitive business arrangements between Hunter Laboratory and WMC—DHI; (2) self-dealing and breaches of fiduciary duty by the individual defendant Hunter and others in connection with the alleged practice of WMC's Physician Associates billing service of not collecting debts from Hunter Lab; (3) self-dealing and breach of fiduciary duty by the individual defendant Hunter and others when Hunter used his influence to join WMC as a general partner in a venture in which Hunter had a partnership interest; (4) self-dealing and breach of fiduciary duty by the individual defendant Hunter and others in connection with their failure to respect the separate corporate statuses of WMC and DHI leading to claims by GHI of overpayments; (5) self-dealing and breach of fiduciary duty by the individual defendant Hunter and others based on mismanagement and the establishment of unfavorable contractual relationships to the detriment of the stock-

holders' equity; (6) breach of fiduciary duty by the individual defendant directors in failing to obtain certified audits of DHI and WMC so that the debts owed DHI and WMC by Hunter Lab could be determined; (7) violation by the individual defendant Hunter and by management of their duty to inform the stockholders of a negotiated settlement involving a buy-out of an earlier threatened stockholders' derivative suit; (8) breach of fiduciary duty by the individual defendant directors when they agreed to give an outside group of doctors 50 percent control of DHI without obtaining stockholder approval; (9) failure by the individual defendant directors to disclose a liquidation of substantially all of WMC's real estate holdings and consequent breach of fiduciary duty; (10) violation of antitrust laws by corporate and individual defendants primarily in connection with the activities of Hunter Lab; (11) breach of fiduciary duty by individual defendant Hunter in engaging in questionable stock transactions in violation of Rule 10b–5 of the Securities and Exchange Commission.

212

sidered as corporate maintenance costs as concluded by the Intermediary.

Payment under Medicare lies only for "reasonable" costs ". . . related to the care of beneficiaries." 42 C.F.R. § 405.-451(a); see 42 C.F.R. § 405.451(c)(3). "Reasonable costs" include those "costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 405.451(b)(2). The term "related to the care of beneficiaries" must be considered in the light of 42 U.S.C. § 1395y(a)(1) (1976) which excludes from Part A or B reimbursement all expenses for items or services "which are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ."

■ The Court does not reach the question of whether the Board was correct in characterizing these particular legal fees as "corporate maintenance costs" or in accepting the broad exclusion from Medicare reimbursement contained in HIM-15, § 2134.9. Rather, the Court concludes that the Board's finding that these legal fees "do not relate to the delivery of efficient health care in the institution but relate to shareholder matters" is supported by substantial evidence and is not irrational or arbitrary.

At the hearing, an expert testified that the lawsuit in question involved predominantly questions relating to the investment interests of one group of investors as opposed to another; only secondary and incidental were the suit's benefits to patient care. To be sure, the line to be drawn here between reimbursable and non-reimbursable expenses is largely one of judgment. The statute, nonetheless, requires that some line be drawn, and the making of that decision is something the Court should leave, as a general rule, to the expertise and wealth of experience the Board enjoys with respect to these matters. Certainly, these fees cannot be deemed the direct expenses of patient care services. They must be reimbursable as the indirect costs of services provided, or not at all. These legal fees primarily

arose, not from the fact that plaintiff operates a hospital, but from the fact that plaintiff is organized as a for-profit entity in corporate form. Costs of this sort are rarely borne by non-profit providers. Moreover, legal fees incurred in connection with stockholder derivative suits are not necessitated by state or federal laws. This fact distinguishes the instant costs from the bulk of the costs held to be reimbursable by the Court of Claims in *Ami-Chanco, Inc. v. United States*, 576 F.2d 320 (1978), cited by the plaintiff. Finally, it is difficult to perceive why the Medicare program should underwrite the inability of these majority and minority investors to agree upon the appropriate corporate course of action.

E. *Allocation of Corporate G & A*

During the relevant time period, WMC was comprised of a number of operating divisions and subsidiaries. These included the hospital, a pharmacy corporation, a billing and collection service, a hotel, a supply company, office buildings, and apartments. Some of WMC's costs were not readily attributable to any one of these divisions or subsidiaries. They were accordingly lumped into one category, called WMC's "general and administrative" ("G & A"). Included in this cost pool were the salaries of WMC's top management, overhead connected with the same, expenses incurred by the treasurer's and comptroller's offices, general legal fees, mail room costs, and other miscellaneous items.

■ Medicare permits the allocation of a portion of these G & A costs to plaintiff's hospital for reimbursement purposes. Such an allocation is customarily accomplished by use of the accumulated costs method. HIM-15, § 2322.9. A provider, though, may always come forward with an alternative method, and if that alternative is demonstrably more equitable and sophisticated, it may be used for Medicare purposes.

■ The accumulated costs method would attribute G & A costs to plaintiff's hospital based on the ratio of the hospital's total costs (the "numerator") to the total

costs of all of WMC's divisions and subsidiaries (the "denominator"). Plaintiff used this method for the two years in question, but with certain modifications. Plaintiff's calculation excluded from the denominator all costs associated with the "Square 105 property," and all costs—except those of a managing agent and of some building engineers—associated with its 1801 K Street office building. This subtraction reduced the denominator by $3 to $4 million to approximately $16.8 million, a reduction which made a $73,000 difference in Medicare reimbursement. The plaintiff excluded these costs because it believed that the properties in question received little or no executive effort. Square 105 was leased during part of the relevant time period on a net/net basis to a parking lot operator which had assumed all aspects of the property's management and operation. During that period, WMC was apparently involved only in accepting and depositing such operator's periodic rent checks. In late 1973, this property was sold, following negotiations conducted primarily by a real estate broker. Similarly, during most of the relevant time period, a professional management company played a large, but not exclusive, role in operating the 1801 K Street building. In March 1974, this building was also sold.

The fiscal intermediary refused to permit these exclusions. The Board affirmed, concluding that the adjustments adopted by the Provider would be disallowed as lacking a clear methodology and adequate documentation.

The Board's conclusion that the Provider had not demonstrated a clear methodology in support of its proposal is correct. The conceptual basis for plaintiff's suggested method is that no cost should be included in the accumulated costs ratio unless actual executive time and effort has been spent in connection therewith. Plaintiff, though, must be consistent in utilizing its suggested approach. It applied its method here only to the ratio's denominator and did not attempt to discover whether the numerator could have been reduced in a similar fashion. Possibly some hospital costs (e. g., fixed, automatic, etc.) had little or no man-

agement time or effort expended in their connection during the relevant time period. Furthermore, plaintiff did not show that the use of relative managerial time statistics inherently operates as a fairer G & A allocation approach than the traditional accumulated costs method. G & A consists of some items unrelated to managerial time and effort.

Several factual considerations also lend support to the Board's decision. The Board could fairly have found a lack of adequate proof that no managerial time and effort was spent with respect to the two properties in question. Both properties were sold during the pertinent time period. The intermediary's auditor testified that, in his opinion, WMC's top management and board would have had to have given considerable attention to these dispositions of substantial assets. Moreover, prior to the assets' sale, the treasurer/comptroller's office had to have been involved in collecting the properties' revenues and in monitoring the supporting vouchers and disbursements, receipts and net profit statements.

F.  *Residents' stipends attributable to work in an independent laboratory*

Medicare regulations permit the reimbursement of "[a]n appropriate part of the net cost of approved educational activities . . . ." 42 C.F.R. § 405.421(a). In this regard, reimbursable costs can include the stipends paid trainees or residents. 42 C.F.R. § 405.421(b)(2). "Appropriate part" is defined to mean "the net cost of the activity apportioned in accordance with the methods set forth in these principles." 42 C.F.R. § 405.421(b)(3).

During the years in question, plaintiff maintained an approved four-year pathology residency training program. Plaintiff paid the residents' stipends in their entirety. The residents, however, did not spend all their time in areas in or related to plaintiff's hospital; rather, they spent much of their time in the many Hunter Lab components located outside of plaintiff's facility. Hunter Lab is recognized as an inde-

pendent laboratory by the Medicare program and bills Medicare for the Medicare covered services it provides on its own account, even where such services are provided to patients in Doctors Hospital. Plaintiff itself does not bill Medicare for the charges of Hunter Lab. Since plaintiff carries the entire cost of the pathology residents' stipends, though, this cost is not borne by Hunter Lab. What is, unfortunately, not clear from the record is whether or not Hunter Lab nonetheless charges Medicare for the time the pathology residents spend in its facilities.

The fiscal intermediary normally allocates residency stipend costs to Medicare using a two-step process. First, residency costs are distributed to the provider's various "cost centers" in proportion to the time the residents spend in those centers. Secondly, the residents' cost which has been allocated to a particular cost center is reimbursed based on the ratio of the Medicare charges of the provider applicable to that cost center to the total charges of the provider with respect to that cost center. Since the Hunter Lab complex outside of plaintiff's hospital is not a "cost center" of Doctors Hospital, this approach would not have permitted plaintiff to claim reimbursement for any of the residents' costs attributable to the time they spent in such Hunter Lab complex.

Plaintiff believed that this method inequitably allocated the costs it bore for its pathology residency program. It accordingly allocated the program's costs based on time surveys of its *other* residents, even though time surveys relating to the pathology residents were available.

The intermediary in its audit adjustment required that plaintiff follow the usual method of allocating residency costs. Plaintiff was permitted reimbursement only for the costs of the pathology residents attributable to work performed within the confines of plaintiff's hospital on plaintiff's patients.

The Board affirmed this determination. It stated that:

it appears that much of the residents' time is spent outside the hospital and the salaries applicable to this portion of the residents' time do not represent costs incurred in the delivery of health care in the Provider's facility to patients of the Provider. Therefore, the Board directs the Intermediary to redetermine the time spent by the residents performing services to hospital patients on the hospital premises and allow only this portion of the residents' salaries.

Proper analysis of the Board's decision requires a consideration of the applicable regulations. For the years in question, plaintiff had to use the "Departmental Method" of apportionment. *See* 42 C.F.R. §§ 405.404(b), 405.452(c)(2). Its objective is to assure that "[t]otal allowable costs of a provider shall be apportioned between program beneficiaries and other patients so that the share borne by the program is based upon *actual services received by program beneficiaries*". 42 C.F.R. § 405.452(b) (emphasis supplied). Under it, the "reasonable costs" of each "ancillary service department," of each "routine service" center, and of each "special care inpatient hospital unit" of the hospital are apportioned between the part to be borne by Medicare and the part not to be reimbursed by Medicare. 42 C.F.R. § 405.452(b)(1). Costs are differently apportioned depending on which of these three types of hospital components is involved. Apportionment is accomplished for each "ancillary department" by use of the ratio of that department's *charges* to beneficiaries for services rendered ("charges" meaning the regular rates charged to both beneficiaries and other paying patients) to the department's total *charges*. 42 C.F.R. § 405.452(d)(6). The cost of "routine services" provided Medicare patients is determined by multiplying the average cost per diem of such services by Medicare inpatient days. 42 C.F.R. §§ 405.-452(b)(1), (d)(7), (e)(2)(ii). A similar approach is used to apportion the costs of "special care inpatient units." 42 C.F.R. §§ 405.452(b)(1), (e)(2)(ii).

The Hunter Lab complex outside of Doctors Hospital does not constitute an "ancil-

lary service department," a "routine service center," or a "special care unit" of the Hospital. This fact alone does not, however, mean that Hunter Lab's costs are not to be taken into account when Medicare reimburses the plaintiff. The *costs* of "units" other than the aforementioned three are sometimes allocated to those three for Medicare reimbursement purposes. This derivative process is governed by the "cost finding" provisions of 42 C.F.R. § 405.453. Under those provisions, the costs of "nonrevenue producing centers"—which include expenses related to administrative, laundry, and residents' services—are allocated to the three aforementioned units (called "revenue producing centers"). 42 C.F.R. § 405.453(d). This attribution is permitted where the non-revenue producing center in question has "rendered services" which are "utilized" by the respective revenue producing center. *Id.* In the case of residents and interns, the Board has customarily measured the rendition of services by hours of service or assigned time. Residents' stipends have therefore been allocated to revenue-producing centers according to the time spent by residents directly or indirectly in the rendition of services to such centers. Here, the Board allowed this allocation only to include time spent on the hospital's premises.

Plaintiff's use of non-pathology residents' time studies clearly did not meet the regulations' "cost finding" criteria. The question remains, however, whether the Board was correct in not allocating to plaintiff's "revenue production centers" any of the time the pathology residents physically spent outside the hospital's premises. On the one hand, none of Hunter Lab's costs are charged to plaintiff's hospital and thus through the hospital to Medicare. In other words, Hunter Lab is neither a revenue-producing nor a nonrevenue-producing center of the hospital. The "cost finding" principles outlined in the regulations appear to deal only with centers which bill through the provider to Medicare. On the other hand, the hospital in this case pays the stipends of these residents whether or not they work within the physical confines of the hospital. Moreover, logic would indicate that residents could "render services" to revenue-producing centers of a hospital even if performed off hospital premises.

The Court concludes that a remand is required on this matter to allow the Board to make further factual determinations. As to these findings, the plaintiff will, of course, continue to bear the burden of persuasion. First, the Board should determine the extent to which the pathology residents' time spent outside of the hospital related to Part A hospital care. Second, the Board must determine whether Hunter Lab itself charged Medicare or the patients in question for the services the pathology residents rendered in its lab to plaintiff's Part A patients. To the extent that Hunter Lab made no such charges, plaintiff should be reimbursed for the Part A-type services the residents rendered in Hunter Lab for the Medicare beneficiaries who were inpatients at Doctors Hospital.

This disposition is consistent with 42 U.S.C. § 1395x(b) (1976) which states that:

> The term "inpatient hospital services" [reimbursable under Part A of the Act] means the following items and services *furnished to an inpatient* of a hospital and (*except* as provided in paragraph (3)) by the hospital—
>
> .   .   .   .   .
>
> (3) such other diagnostic or therapeutic items or services, furnished by the hospital *or by others* under arrangements with them made by the hospital, as are ordinarily furnished to inpatients either by such hospital or by others under such arrangements; . . . (Emphasis supplied.)

*See also* 42 C.F.R. § 405.116(e).

All parties agree that 42 C.F.R. § 405.-486(b)(1) authorizes Medicare reimbursement for the time the pathology residents spent in the Hunter Lab component located *in* plaintiff's hospital. Such lab is apparently a "hospital department" within the intendment of that regulation.