BARFIELD, Judge.
HBA Corporation (HBA) appeals an order of the Department of Health and Rehabilitative Services (HRS) overturning the hearing officer’s recommended order and sustaining audit adjustments to HBA’s depreciation expense for a nursing home under the Florida Medicaid program. We find that HRS improperly rejected the hearing officer’s interpretation of Florida Administrative Code Rule IOC-7.481, but otherwise affirm the agency’s order.
This case arises under Title XIX of the federal Social Security Act which establishes a jointly funded program (Medicaid) which provides, inter alia, long-term care services for the aged through contracts with participating nursing homes pursuant to the federally approved Title XIX Long-Term Care Reimbursement Plan. The state agency charged with administering the Florida Medicaid plan, under which the state must provide payment of a reasonable and adequate reimbursement, is the Department of Health and Rehabilitative Services (HRS). § 409.266(1), Fla.Stat. (1980).
Reimbursement rates are established from the provider’s allowable costs for the prior cost reporting period. The provider claims its allowable costs on “cost report” forms. Fla.Admin.Code Rule 10C-7.-48(4)(a)5(a). To determine whether a claimed cost is reimbursable under the Florida Medicaid program, one must first determine if a specific provision exists in the state plan; if no provision exists, one must look to the Provider Reimbursement Manual (HIM-15); finally, generally accepted accounting principles may be considered.
Upon receipt of a provider’s cost report, HRS is required to analyze the reported data, undertake any necessary audits, and inform the provider of the amount of Medicaid reimbursement to which it is entitled. The audits are performed by HRS field officers, or an accounting firm under contract with HRS. Fla.Admin.Code Rule 100-7.481(3). After the audit is completed, and before publication of the audit report, the provider must be given an “exit conference” to resolve any discrepancies in the figures. Fla.Admin.Code Rule 10C-7.-481(4). If the dispute is not resolved at the exit conference, the provider has 30 days in which to submit other evidence before the audit report, containing the adjustments made by HRS, is published. Fla.Admin. Code Rule 10C-7.481(5).' The provider may request an administrative hearing under *463 section 120.57, Florida Statutes, within 30 days from receipt of the audit report. Fla. Admin.Code Rule 100-7.481(6).
Ocean View Nursing Home, which is managed by HBA, was purchased as an ongoing nursing home facility on September 1, 1980 for $1,355,000. It includes two adjacent parcels of land, a total of 2.24 acres divided by a street, in New Smyrna Beach. The nursing home is located on the larger parcel and consists of five connected wings. The 100 wing was built in 1963; the 200 wing in 1965; the 300 wing in 1967; the 400 wing in 1973. Another wing was added after the purchase, but is not of concern in this appeal.
An appraisal was made on September 12, 1980, following the guidelines in section 134, HIM-15. The parties dispute whether the appraisal was made only to establish the facility’s value (HBA’s position) or to establish as well the useful life for each asset (HRS’ position). The appraiser inspected the facility, determined that its “highest and best use” was as a nursing home, and, using the Market Data Approach [1] and the Cost Approach[2], determined that the fair market value of the facility was $1,350,000 and that the remaining useful life of the nursing home building was 32 years.
Ocean View’s annual cost report included a claim for depreciation of the existing building in the amount of $54,828.00[3], based upon an estimated useful life of 25 years for the first wing and 40 years for each of the other wings, resulting in a weighted average life for the whole building of 33 years,[4] less the expended years for each wing. The cost report was audited by HRS and an adjustment of $26,364.00 was made to the claimed depreciation, based upon the appraisal estimate of 32 years remaining useful life. HBA contested the department’s use of the appraisal in making this adjustment, but did not submit any other evidence within the 30 days allowed under Florida Administrative Code Rule 100-7.481(5). When it received the audit report, HBA requested a hearing pursuant to section 120.57, Florida Statutes.
At the hearing, Barry Kantrowitz, an officer of HBA, testified as an expert in health care accounting that he determined the useful life of the Ocean View facility in accordance with the American Health Association (AHA) Guidelines set out in HIM-15. The cost report was reviewed and approved by Donald Harder, a certified public accountant and veteran health care accountant. HRS challenged the method used by HBA to determine useful life because it did not take into account improvements made to the facility (a sprinkler system, a modern call and alarm system, and extensive remodeling) which would have extended its useful life. HRS based its *464 determination of useful life on the appraisal, which did take the improvements into account.
HBA argued that generally accepted accounting principles and Medicaid regulations require the provider to estimate the economic life of the facility as a nursing home (the number of years which the property is expected to be useful for the purpose to which it is presently being put) and that the appraisal addressed physical life (the number of years which the building is expected to stand) and therefore had no bearing on the determination of useful life for reimbursement purposes. HBA also asserted that its method is supported by generally accepted accounting principles; that certain instances of improper construction techniques were found during the most recent renovation which tend to decrease the facility’s useful life; and that the facility is located near the ocean, where the salt spray and the strong sun will cause “major havoc” to the building.
After hearing witnesses for both sides,[5] the hearing officer issued a recommended order finding that each party’s method of determining useful life was in keeping with federal regulations and guidelines and with generally accepted accounting principles; that there was substantial competent evidence of both improvements and inherent problems in the construction of the Ocean View facility; and that these conditions tended to offset each other. The hearing officer concluded that since there is no exclusive method for determining useful life, and the provider adequately supported its method, it was not necessary that the provider defer to the method chosen by HRS, and that Ocean View was entitled to claim $50,881.00 as depreciation on the old portion of the facility for the 1981 fiscal year.[6] The hearing officer also found that Florida Administrative Code Rule 1007.-481(5) did not prohibit Ocean View from establishing its entitlement to reimbursement at the section 120.57 hearing.
HRS filed exceptions to the recommended order.[7] In his final order, the Secretary adopted all the hearing officer’s findings of fact except the finding that the “pro and con conditions” offset each other to the extent that average conditions were found to exist. The Secretary determined that this finding was not based on competent substantial evidence and replaced it with the following finding: “In preparing its determination of the remaining useful life of Ocean View Nursing Home, Petitioner did not determine which betterments, if any, had been made to the facility.” The Secretary also rejected the majority of the hearing officer’s conclusions of law. He found that the formula used by HBA for determining the useful life was unacceptable because it did not take into account betterments and improvements, and sustained the audit adjustment. He also rejected the hearing officer’s interpretation of Rule 100-7.481(5) and interpreted the rule to prohibit the introduction at the section 120.57 hearing of evidence not presented to HRS within 30 days from the exit conference.
HBA raises three issues on appeal, which we restate as follows: I) whether the final order properly rejects an essential finding of fact of the hearing officer and substitutes another finding of fact; II) whether the final order correctly interprets the applicable Medicaid regulations and properly requires appellant to adopt HRS’ method of determining useful life; and III) whether the agency correctly interpreted Florida Administrative Code Rule 1007.481(5).
ISSUE I
Section 120.57(l)(b)(9), Florida Statutes (1980), provides that an agency in its final order may not reject or modify the findings of fact in the recommended order unless the agency first determines from a *465 review of the complete record, and states with particularity in the order, that the findings of fact were not based upon competent substantial evidence, or that the proceedings on which the findings were based did not comply with the essential requirements of law. In his final order, the Secretary rejected the last sentence of the hearing officer’s findings of fact (that the inherent problems in the construction and with the weather environment offset the improvements to the facility) because, “there is no factual competent substantial evidence to support the third sentence.” The rejected finding was replaced with a finding that in preparing its determination of the remaining useful life of the nursing home, HBA did not determine which better-ments, if any, had been made to the facility. This finding is presumably based upon the fact that the hearing officer found that improvements had been made, that HBA admitted it did not determine which better-ments or improvements, if any, had been made to the facility, and that the appraisal report took into account any improvements that had been made. The Secretary properly found that the hearing officer’s rejected finding of fact was not supported by competent and substantial evidence in the record.[8]
The evidence in the record supports the proposition that improvements and bet-terments have been made which would extend the useful life of the nursing home and that there are conditions which would shorten its useful life, such as improper construction and climatic conditions. It is only the final sentence of the hearing officer’s proposed findings of fact, that these conditions offset each other to the extent that average conditions are found, that is not supported by competent substantial evidence, because appellant’s expert was unable to quantify the extent to which the facility’s useful life would be reduced because of climatic conditions and because the improvements, while to some extent specified in the appraisal report, were also not quantified. If none of the pro and con effects were quantified, and no witness testified that these effects offset each other, the hearing officer could not properly find that the useful life of the facility was unaffected. HBA’s statement that the building improvements amounted to only $10,000 (less than 1% of the building’s value) is incorrect and misleading. A review of the appraisal indicates that, although extensive remodeling and other improvements were made on the building, the only improvements which were quantified were those made to the land itself, in the amount of $10,000. HBA’s expert witness admitted that he did not make any inquiry as to betterments that may have been made before the nursing home was purchased, and that if betterments had been made, they would extend the useful life of the building. The Secretary’s substituted finding of fact is supported by competent substantial evidence in the record and is affirmed.
ISSUE II
Because HBA did not take into account the effect of betterments or improvements on the estimated useful life of the facility, its calculation of the' remaining useful life was not in accordance with the federal regulations and was properly rejected by the Secretary. Federal Health Insurance for the Aged and Disabled, 42 C.F.R. § 405.414(c), defines betterments and improvements as “changes which ex *466 tend the estimated useful life of an asset at least two years beyond its original estimated useful life, or increase the productivity of an asset significantly over its original productivity,” and requires the provider to capitalize and pro-rate the cost of better-ments and improvements over the remaining estimated useful life of the asset, as modified by the betterment or improvement. See also § 108.2, Providers Reimbursement Manual (HIM-15).
42 C.F.R. § 405.415(b)(7) defines “useful life” of a depreciable asset as the normal operating or service life to the provider and requires that in initially estimating the useful life, providers must use (in order of preference) HCFA useful life guidelines (if published), AHA useful life guidelines, useful life guidelines published by the IRS, or a method approved for use by the intermediary as provided in § 401.415(b)(7)(i)(B). This subsection allows the provider to specifically request approval by the intermediary of a different useful life than those specified in the required guidelines, if the provider’s request is properly supported by acceptable factors that affect the determination of useful life (obsolescence due to economic and technological changes, climatic and other local conditions, the provider’s policy for repairs and replacement, etc.).
These two regulations, read in pari mate-ria, require the provider to initially determine estimated useful life using the preferred guidelines (in this case, AHA 1973 Chart of Accounts for Hospitals) and to modify this estimate to the extent that betterments or improvements have extended the useful life of the facility; the provider may, subject to approval by the intermediary, also modify useful life to the extent that other conditions tend to decrease the number of years the facility may be expected to be useful as a nursing home. HBA used the estimated useful life from the AHA Guidelines, without taking into account the effect of betterments or improvements, contrary to the federal requirements. To the extent that HBA claims it took into account the betterments arid improvements, but that these were cancelled out by the improper construction techniques and climatic conditions, HBA did not follow the procedures required by the regulations, since it did not specifically request approval by HRS and did not support its position by presenting evidence quantifying the effects of the “pro and con” conditions. Since AHA Guidelines applicable to the shell of a building do not take into account the effect of substantial additions and alterations that extend the inherent technological useful life of the asset, the Provider Reimbursement Review Board has held that it was proper to rely on an IRS audit that did consider the substantial renovations in redetermining the building’s useful life. PRRB Dec., No. 77-D47, aff’d without op. by HCFA Admr. Dec., Sept. 3, 1977, aff’d in part (and rev’d in part on other grounds) by Doctors Hospital, Inc. v. Califano, 459 F.Supp. 201 (D.C.1978).
The question remains whether HRS auditors, having determined that the estimated useful life upon which HBA’s depreciation calculations were based was in error, could adjust the depreciation values by substituting the useful life found by the appraiser for that submitted by HBA. The hearing officer specifically found in his recommended order that the appraisal took into account improvements which had been made to the basic facility; that HRS’ use of the appraisal to establish years of useful life is an acceptable accounting practice related to the determination of depreciation; that the appraisal submitted by the provider is not limited to the circumstance of recognition of the provider’s right to participate in the reimbursement program, but may properly be used in an effort to determine the useful life of the facility to the provider; that the appraisal may not be excluded on grounds of hearsay and is not irrelevant; and that the method which HRS used to determine the question of allowable costs of depreciation was in keeping with the federal regulations, agency rules, and sound accounting principles.
HBA did not submit exceptions to these findings, which were subsequently adopted *467 by the Secretary. Based upon his finding that HBA’s determination of estimated useful life was unacceptable because it did not take into consideration betterments and improvements, the Secretary rejected the hearing officer’s conclusions that HBA’s method for determining useful life was equally acceptable and that HBA was not required to defer to the agency’s method. Having accepted the hearing officer’s conclusion that HRS’ method was acceptable, and having properly rejected the hearing officer’s conclusion that HBA’s method was acceptable, the Secretary properly sustained the adjustments made by HRS to HBA’s depreciation calculations.
Although it did not file exceptions to the hearing officer’s findings regarding the acceptability of HRS’ method for determining useful life, HBA now argues that HRS’ exclusive reliance on the appraisal “is unfounded and inferior to the method chosen by Ocean View”; that the regulations do not give the agency discretion to utilize any method other than the AHA Guidelines; and that the substituted conclusions of law are based upon the allegedly erroneous substituted finding of fact.
The federal regulations, provider reimbursement manual, and agency rules require the provider to annually submit a cost report which includes, inter alia, the amount of depreciation of each asset, based upon its historical cost and its estimated useful life to the provider. Historical cost is defined as the cost incurred by the present owner in acquiring the asset, but is limited in that it may not exceed the current reproduction cost, less accumulated depreciation, or the fair market value at the time of purchase. In order to satisfy HRS that the purchase price for Ocean View did not exceed this limitation, HBA submitted an appraisal. Although HBA contends that the appraisal could not be used for any purpose other than to determine historical cost, the hearing officer concluded otherwise and his conclusion was accepted by the Secretary. Neither the regulations, the manual, nor the agency rules indicate that information included in an appraisal submitted by the provider for the purpose of establishing its eligibility for reimbursements under the Medicaid program may not be utilized by the intermediary for the purpose of determining the amount of depreciation for which reimbursement is warranted. Section 104.12, Providers’ Reimbursement Manual, states that, for Medicare purposes, the term “appraisal” refers primarily to the process of establishing or reconstructing the historical cost of an asset acquired in a past period and includes a systematic, analytic determination and the recording and analyzing of property facts, rights, investments, and values based on a personal inspection and inventory of the property. Under this section, an appraisal expert is one experienced and specialized in multi-purpose appraisals of plant assets involving the establishing or reconstructing of the historical' cost of such assets and who demonstrates a knowledge and understanding of the regulations involving reimbursement principles, particularly those pertinent to depreciation. Section 134, Providers’ Reimbursement Manual, establishes appraisal guidelines. Section 134.2 provides:
An appraisal for program purposes should be made only where the provider has no historical cost records or has incomplete records of the depreciable fixed assets. The appraisal should develop the historical cost and related information that will assist in the construction, reconstruction, or revision of accounting records to enable the provider to make proper distribution of depreciation expense in Medicare cost reports.
(emphasis added). Section 134.9 provides that an appraisal program shor ’d include, inter alia, a physical inventory and listing of pertinent data for all applicable assets; the acquisition cost, classification, and salvage value for each asset; an estimated useful life for each asset; and depreciation calculations. Section 134.10 provides that in the appraisal report, the listing of assets must contain all necessary and pertinent information, including, inter alia, historical cost, acquisition date, salvage value, and estimated useful life to provider.
*468 HBA contends that the “useful life” found by the appraiser is in fact the “inherent physical life” (i.e., the number of years during which the building is expected to stand), and not the “economic useful life” contemplated by the regulations. Useful life defined by section 104.17, Providers’ Reimbursement Manual, is an asset’s “expected useful life to the provider, not necessarily the inherent useful or physical life.” The manual indicates that a presumption must be made that the useful life of an asset will correspond with its inherent physical life unless the provider establishes otherwise, based upon convincing reasons supported by adequate documentation. Id. A review of the appraisal report as a whole indicates that the appraiser estimated the useful life of the facility as a nursing home and that he understood the contribution of physical, functional, and technological obsolescence to the depreciation of the facility. Even if his estimated useful life is construed as an estimate of inherent physical life, HBA has not established by clear evidence that Ocean View’s economic useful life does not coincide with its physical life.[9] The determination of useful life was a necessary part of the appraisal, used to determine the accumulated depreciation for purposes of the cost approach. Florida Administrative Code Rule 10C-7.481(2)(a) establishes that the purpose of an audit by the agency is to determine the correctness and propriety (i.e., conformance to federal and state regulations) of the calculations in the annual cost report. The rule also provides: “The audit report shall constitute prima facie evidence of the propriety of the adjustments contained therein. The burden of proof is upon the provider to affirmatively demonstrate its entitlement to the Medicaid reimbursement.” HRS’ expert witness testified that HRS considers it appropriate to use information from the appraisal report submitted by the provider in adjusting incorrect items of the cost report, and that it routinely does so. Under the circumstances, HRS' method of determining depreciation based upon the useful life in the appraisal was acceptable.
ISSUE III
In its proposed recommended order and in its exceptions to the recommended order, HRS relied upon Dania Nursing Home, Inc. v. DHRS, 5 FALR 1651-A (1983), in asserting that appellant “neglected to document its audit exception and cannot complain now that the exception is wrong.” In Dania, an apparently unap-pealed order, HRS rejected the hearing officer’s interpretation of Florida Administrative Code Rule 100-7.481(5), and interpreted the rule to prohibit the provider from presenting at the de novo hearing evidence not furnished to the agency within 30 days from the date of the exit conference. This interpretation of the rule is incorrect. The hearing officer in Dania and the hearing officer in this case properly interpreted the rule as one which creates an opportunity, following the exit conference, for a provider to offer further information in support of its contentions and which allows a point of finality after which the agency is able to finalize and release its audit report containing all adjustments and disallowed expenditures. This rule in no way prohibits the establishment of the provider’s claims in a timely requested de novo formal hearing under section 120.57(1), Florida Statutes. Since the record indicates that the hearing officer considered all the evidence presented to him at the 120.57 hearing, and there is no indication in the final order that the Secretary refused to consider any of the testimony, it does not appear that the Secretary’s incorrect interpretation of the rule had any effect on his final order. We therefore find this error to be harmless.
*469 With the exception of the Secretary’s incorrect interpretation of Rule 10C-7.-481(5), the agency’s order is
AFFIRMED.
ERVIN and JOANOS, JJ., concur.

. He compared recent sales of similar nursing care developments to arrive at an estimated value of 11,360,000.

. He determined the value of the underlying land, using comparable sales in the area, then added the'depreciated cost of the building to arrive at an estimated value of $1,350,000.
He found the depreciated cost of the building as follows: He estimated the cost of reconstructing the building; estimated a 15% depreciation for the entire building (based upon an estimated useful life of 45 years for a nursing home of this type with good construction, and an effective maintenance and remodeling program, and upon the fact that the four wings of the building were 17, 15, 13, and 7 years old, respectively); subtracted the depreciation from the reconstruction cost; and added the depreciated cost of equipment and site improvements.
He noted in his appraisal that depreciation can be due to physical obsolescence, functional obsolescence, or economic obsolescence; that the building was in “excellent condition”; that extensive remodeling had apparently been done as each wing was added, so that "the entire building appears much newer than its actual age”; and that a sprinkler system and modern call and alarm system were installed sometime after the first two wings were constructed.
He did not consider a third approach, the Income Capitalization Approach, appropriate under the circumstances.

. HBA has conceded that this value should be corrected to $50,881.00, due to a correction in the number of beds in each wing. HBA also claimed a depreciation for the new addition. This is not at issue here.

. HBA concedes that this value should be corrected to 34½ years, due to the correction in the number of beds.

. Including some expert witness testimony that had not previously been submitted to the HRS auditors.

. HBA accepts this adjustment (see footnote 3).

.There is no indication in the record that HBA filed exceptions to any of the hearing officer's findings or conclusions.

. HBA argues that the final order violates section 120.57(l)(b)(9), "by merely concluding that the hearing officer's findings were not based upon competent substantial evidence and not stating with particularity why they were not.” HBA asserts that the Secretary provided no explanation for "why the hearing officer’s findings were not competent or substantial," citing Kibler v. DPR, 418 So.2d 1081 (Fla. 4th DCA 1982) and Lewis v. DPR, 410 So.2d 593 (Fla. 2d DCA 1982). The Secretary did not find that the hearing officer’s finding was not competent or substantial, but that the finding was not supported by competent substantial evidence in the record. This statement satisfies the requirements of the statute. Kibler and Lewis involved orders which were summarily rejected in toto, with only a vague explanation that all of the findings of fact were unsupported by competent substantial evidence in the record. HBA’s reliance upon these cases is misplaced.

. Under the "straight-line” method of depreciation used by the provider, the annual depreciation allowance is determined by dividing the cost of the asset (less the salvage value) by the years of useful life. The record indicates that the salvage value was apparently determined to be zero. This supports the presumption that the useful life of the nursing home to the provider coincides with the inherent physical life of the building, i.e., when the useful life has expired, the building itself (not including the land) will have no value.