**OVERLOOK NURSING HOME, INC.**

v.

**The UNITED STATES.**

No. 188–72.

United States Court of Claims.

May 18, 1977.

Richard H. Gens, Boston, Mass., attorney of record for plaintiff. Leppo & Gens, Boston, Mass., of counsel.

Arlene Fine, Washington, D.C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, New York City, for defendant. Carol Tootle, Atty., Social Security Administration, Dept. of HEW, Baltimore, Md., of counsel.

Before NICHOLS, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This case is before us on cross-motions for summary judgment. Plaintiff sues the United States for payment allegedly due under 42 U.S.C. § 1395x(v), for services it rendered pursuant to the Medicare program. Under the program, a hospital or other "provider of medical services," as defined in § 1395x(u), that wishes to treat patients eligible for medical assistance through Medicare may apply with the Secretary of Health, Education and Welfare for recognition as a "provider." Providers agree, once enrolled, to furnish medical care to elderly patients without charge, but to accept as compensation reimbursement for the "reasonable costs" of such services, § 1395f(b). Providers may nominate as "fiscal intermediaries" any qualified public or private agency to determine the amount of reimbursement due them, and to make the payments, § 1395h. Intermediaries' payments to providers are fully funded by advances from the Federal Hospital Insurance Trust Fund, administered by the United States.

Between November 1968 and January 1970, plaintiff was a provider of Medicare services in Boston, Massachusetts, and the Travelers Insurance Company was its fiscal intermediary and, thereby, an agent of the United States, the perennial defendant in our court. For the entire time it participated in the program, plaintiff claimed $1,009,800 in reimbursable costs, of which Travelers paid $636,500. On December 16, 1970, plaintiff's representatives met with Travelers field representative and its auditor to discuss various discrepancies in the accounts. The parties agree that plaintiff then acquiesced in the auditor's disallowances and agreed to accept $125,335 in full payment of their claims. No such payment was ever made, however, because Travelers later disallowed all but some $4,000 of plaintiff's claims during a post-audit review conducted at its home offices. Unable to collect more than this amount, plaintiff timely sued here on the grounds that the agreement of December 16 bound the Government to payment of the sum agreed upon, and that, in any event, Travelers latest reductions contravened the Medicare statute and regulations. The case never reached trial, though, because our trial judge suspended proceedings pending the outcome of an administrative hearing on plaintiff's claims. The court concurred in the suspension, by its order of March 1, 1974, while preserving plaintiff's opportunity to reassert its claim based on an accord and satisfaction.

An administrative board, convened under 20 C.F.R. §§ 405.490–499 (1974), has now heard the dispute and rendered its decision denying plaintiff any further recovery. Now plaintiff returns to this court so we might address the once-deferred issue regarding an agreement to pay a stated sum, and also for our review of the board's several determinations. Additionally, plaintiff now contends that by its composition the hearing board was inherently biased, depriving plaintiff of its right to the due process of law. Defendant, for its part, once again challenges our jurisdiction to hear such a case as this based in the Medicare statute. Before we reach the merits, therefore, we shall first reiterate why we consider ourselves empowered to exercise jurisdiction in this case, and shall elaborate

upon the proper scope of review. Then, before reaching the merits, we shall explain why the Medicare appeals boards do not offend the principle of due process.

■ Defendant reasserts the challenge to our jurisdiction that it earlier advanced in *Whitecliff, Inc. v. United States,* 536 F.2d 347, 210 Ct.Cl. 53 (1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), based on the finality language in § 405(h) of Title 42, and the Supreme Court's recent decision in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1974). We held in *Whitecliff* that in the absence of specific statutory procedures for, or limitations upon, judicial review, a court can review provider reimbursement disputes under its generally applicable grant of jurisdiction. In our court, jurisdiction rests upon 28 U.S.C. § 1491 where, as here, plaintiff seeks money from the United States. Defendant has added nothing new to its argument, and we are aware of no reason to retreat from our position. We continue to hold that Congress did not preclude judicial consideration in any court of a provider's reimbursement rights, when it provided against judicial review of a social security beneficiary's claims, except in a single specified channel. We adhere, therefore, to the view we expressed in *Whitecliff.*

■ Once we undertake to exercise jurisdiction over such administrative determinations, we should describe what standard of judicial review the statute prescribes. Although we have held that § 405(h) does not entirely preclude judicial review, it does reflect Congress' obvious desire to commit the resolution of factual disputes to the technical expertise collected in an administrative agency. Consistent with such purpose, the court should largely defer to the determinations of the administrative tribunals duly constituted. 4 K. Davis, Administrative Law § 30.09 (1958). We might properly review those findings to be sure that they are not arbitrary or capricious or unsupported by substantial evidence, but beyond that we must recognize that our qualifications are limited and should limit our inquiry. On the other hand, we do stand ready to test each board's holding for compliance with statutory provisions and regulations that have the force and effect of law. *Whitecliff, Inc. v. United States,* 536 F.2d at 351, 210 Ct.Cl. at 58; *Goldstein v. United States,* 201 Ct.Cl. 888 (order), *cert. denied,* 414 U.S. 974, 94 S.Ct. 287, 38 L.Ed.2d 217 (1973). And, of course, our power to review constitutional questions could not be foreclosed without itself raising a serious constitutional problem. *Weinberger v. Salfi,* 422 U.S. at 762, 95 S.Ct. 2457. But an error of law, unlike a decision over disputed questions of fact, is peculiarly within our province as an appellate court to correct. Other federal courts have arrived at this result via the Administrative Procedures Act, specifically 5 U.S.C. § 706. *See, e. g., Aquavella v. Richardson,* 437 F.2d 397 (2d Cir. 1971); *Temple Univ. v. Associated Hosp. Serv. of Philadelphia,* 361 F.Supp. 263, 270 (E.D.Pa.1973). Within our jurisdiction, this scope of review in Medicare disputes resembles our oversight of administrative decisions in Government contract disputes, under Wunderlich Act standards, 41 U.S.C. §§ 321–22. Thus, our review considers all of plaintiff's objections to the hearing panel's results, at least insofar as each alleges defendant's denial of a constitutional guarantee or a violation of applicable law.

■ Plaintiff complains that the composition of the administrative board was so inherently biased that it deprived plaintiff of an impartial decisionmaker as due process requires. Plaintiff's objection stems from the uncontroverted fact that the majority of the three-member board were Travelers employees. We had a similar contention before us in *Whitecliff,* where we noted that it raised a substantial question but one that we did not then need to decide, 210 Ct.Cl. at 61, 536 F.2d at 352–53. Now we do.

Plaintiff's theory seems to be that Travelers, although a mere intermediary in Medicare matters, would have an interest in similar issues where it would be itself the health insurer under private, non-govern-

mental plans, and would wish to establish precedents unfavorable to providers. But plaintiff accepted Travelers as an intermediary and evidently desired to benefit from its experience with the problems to be solved, no doubt antedating that of the federal bureaucracy.

Plaintiff's contention rests first upon the Supreme Court's parting comment in *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), that an essential element of due process is a hearing before an impartial decisionmaker. The Court did linger on the point long enough to remark that an official of an interested agency would not necessarily be disqualified as a decisionmaker, however, so long as he had not already participated in making the determinations under review. *Id.* More recently, though, we learned in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), that such an official will not be disqualified automatically even if he had earlier investigated the dispute under review. Plaintiff there was a physician who complained of bias in a state medical disciplinary board that would determine whether to suspend his license to practice medicine, because of his having engaged in prohibited conduct, after that same board had already conducted a separate investigatory hearing into the matter. This was not an instance, the Court explained, where "experience teaches that the probability of actual bias * * * is too high to be constitutionally tolerable." *Id.* at 47, 95 S.Ct. at 1464; but *cf., e. g., Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (adjudicator had personal pecuniary interest in the outcome); *Taylor v. Hayes,* 418 U.S. 488, 501–03, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (judge had become target of personal abuse from party before him). In most other circumstances, the court seemed to say, the allegation of an unconstitutional risk of bias bears a more difficult burden, for it must overcome a presumption of the adjudicator's honesty and integrity and "it must convince that, under a realistic appraisal of psychological tendencies and human weakness" that the situation poses such a risk of actual bias that due process

forbids the practice. 421 U.S. at 47, 95 S.Ct. 1456; *see also United States v. Margan,* 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1940) (decisionmaker who publicly criticized court decision precedential to ratemaking issue nevertheless not disqualified from setting rates where grounds for criticism later admitted to be unfounded and bias sincerely disclaimed).

Plaintiff has not persuaded us here that such a tangible risk of bias exists. At the outset, we see that to comply with the rules the board adopted, no board member could have had any previous direct responsibility for the reimbursement determinations under review, 20 C.F.R. § 405.495 (1974), and plaintiff does not suggest that the rule was violated. Indeed, plaintiff has not alleged any instance of actual bias with regard to this case, but complains that the board was inherently, potentially biased because two of its three members were employed by the intermediary.

*Lopez v. Henry Phipps Plaza South, Inc.,* 498 F.2d 937 (2d Cir. 1974), presented the Second Circuit an analogous situation, where a tenant of a publicly assisted housing project, whose landlord refused to renew the lease, objected that the manager of another such project was so management-oriented that he could not impartially evaluate the grounds put forward for the nonrenewal. The court took a practical approach, we think consistent with the Supreme Court's own attitude in holding that nothing in *Goldberg v. Kelly* established that due process is denied simply because the hearing officer was also an officer of another project. Indeed, the court entertained the notion that such a decisionmaker's experience might have salutary effect. 498 F.2d at 944; but *cf. Escalera v. New York City Housing Auth.,* 425 F.2d 853, 863 (2d Cir. 1970) (hearing officer should not be the same project manager who instituted proposed action against tenant). To agree with plaintiffs in *Lopez* would have had farfetched results. The Second Circuit could not conceive, for example, that public university students might be denied due process when disciplined by members of

faculty or administrators, although such persons presumably would be more inclined than others to give high priority to maintaining order on campus. *Id.* Neither, we add, does a constitutional question arise when the contract appeals boards, composed of Government employees, sit to resolve Government contract disputes. Nor, finally, is due process offended in the present case solely because hearing officers were the intermediary's employees.

"Of course, we should be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice." *Withrow v. Larkin,* 422 U.S. at 54, 95 S.Ct. at 1468. But this plaintiff's theory is two conjectural and the character of the bias alleged too attenuated for us to agree that due process, a flexible and practical concept by nature, was offended.

■■■ We proceed to address the merits of plaintiff's petition. Plaintiff argued before the board that the December 16 meeting culminated in an accord and satisfaction which precludes both the intermediary and the Government from reevaluating the reasonableness of plaintiff's reimbursable costs. The board declined to make factual findings on this point, but, rather, seemed to assume that such an agreement was consummated. That notwithstanding, the board concluded, the Government cannot be bound to reimburse plaintiff an amount thereafter found to be unreasonable. Of course, the board was correct in stating the law that the Government is not bound by the unauthorized acts of its agents. *Federal Crop Ins. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), but we think the board assumed the result it was to decide. Although we affirm the board's result, we arrive there by a somewhat different route.

If cases like these teach anything, it is that regardless of copious regulatory guidelines, a determination of reasonableness in a particular situation is largely a subjective judgment. Thus, the important question presented here is not what payment we deem reasonable, but what agency was authorized to determine reasonableness. If an authorized agency agreed and stipulated to pay a certain sum as reasonable, we can assume that determination should be final. Plaintiff contends, as it must, that the audit firm was so authorized and acted on the intermediary's behalf in entering an agreement to pay a certain sum in complete settlement of the dispute. That agreement, according to plaintiff, bound both the intermediary and the Government in turn. We disagree that the auditor's authority was so broad. Both the regulations, see, e. g., 20 C.F.R. §§ 405.401, 405.405, and the contract between the Secretary and Travelers, particularly Article II, delegates to the intermediary only the authority to implement the published guidelines and to determine the reasonableness of cost reimbursements. It is, further, the intermediary's contractual responsibility to conduct necessary audits, *see* Article IX of the contract. While the intermediary might subcontract the audit function, with the Secretary's prior approval, nowhere does it appear that the intermediary may delegate the authority to determine reasonableness. An intermediary might consider its auditor's report, but is not bound to it. We cannot deny that the intermediary could rationally require a post-audit review of the audit report before committing itself to pay a definite sum. We subscribe to defendant's characterization of the December 16 agreement as merely the auditor's assurance to plaintiff that it would submit its report as represented, and recommend to Travelers no further reductions. This it did, but that did not constitute any agreement binding upon the intermediary or defendant to pay the sum recommended.

■■ Plaintiff objects to the board's treatment of certain overhead costs. When it first enrolled in the Medicare program, plaintiff was certified by the Commonwealth of Massachusetts to provide medical services to no more than 20 beds. Later, plaintiff's certificate was enlarged to 30 beds, and still later to 90. This tapered commencement of operation was standard operating procedure in Massachusetts, and necessarily enhanced the per patient cost in the beginning. From the beginning, plain-

tiff had constructed and occupied an entire physical plant, so that the cost difference between operating 20, 30, or 90 beds was mainly a matter of size of the staff rather than the physical facilities. Thus, plaintiff incurred operating expenses both from licensed facilities already serving patients as well as from unlicensed portions of the plant not yet open to patients. When plaintiff sought reimbursement of its operating expenses, the intermediary disallowed the portion of the costs not related to patient care at the operating level reached when the cost was incurred. The board upheld the intermediary's disallowance as proper under 20 C.F.R. § 405.451(c)(3) (1974) and § 2102.1 of the Providers' Reimbursement Manual (HIM–15) (7–67). These rules express the general intent that the Medicare program will bear costs incurred directly or indirectly with respect to caring for eligible patients, but no other costs. The question plaintiff raises, as it did before the board, is whether its entire overhead costs, including the cost of maintaining facilities unavailable to Medicare patients, is nevertheless sufficiently related to the program that it qualifies as a reimbursable indirect cost.

We agree with the board that such costs are not reimbursable on the basis of either of the rules cited. Nor do we think reimbursement is mandated by § 2132.6 of the Manual, upon which plaintiff bases its entitlement to these as "expansion costs." The costs contemplated there are operating expenses related to new construction or physical plant renovations. By contrast, plaintiff's facility was completely equipped, but awaiting only additional staff and patients. We do think, however, that these costs are reimbursable to the extent provided in § 2132.1 of the Manual, which states:

> In the first stages of operation, a new institution incurs certain costs in developing its ability to care for patients prior to the admission of such patients. Staff are obtained and organized, and other operating costs are incurred during this time of preparation which cannot be allocated to patient care during that period because there are no patients receiving services. These preparation costs may be considered to relate to services provided to patients who come into the facility subsequent to the time of preparation, when patient care operations begin. Therefore, it is proper that such costs, commonly referred to as "start-up costs," be considered as deferred charges under the Medicare program and allocated over a number of periods which benefit from such costs.

The costs at issue seem to come within the situation so described. The board disregarded this provision of the Manual because it had not been promulgated until after the costs were incurred. Although the Manual was not officially effective, some such provision was necessarily implicit in the disallowance of these costs as operating expenses. It properly guides us to an understanding of what the regulations proposed to include among indirect costs. Thus, plaintiff is due reimbursement for that portion of its start-up costs amortizable over the period it participated in the program.

Under another rubric, the intermediary apparently increased plaintiff's reimbursable per diem cost by 20 percent for "low occupancy" in 1968 and 5 percent in 1969. This may have been intended to subsume the start-up costs as here discussed to the extent deemed allowable, or these may have contemplated different types of costs. Furthermore, since oral argument, the parties have advised the court that plaintiff did receive some reimbursement earmarked as start-up costs, but now they cannot agree upon what that amount included. Therefore, plaintiff is entitled to a factfinding hearing to clarify this confusion, and a computation of its additional entitlement due, if any, by our trial judge under our Rule 131(c). Plaintiff will bear the burden of proving what amount of start-up costs are allowable in the first place, and what part thereof is properly amortizable during the period that plaintiff participated in the Medicare program. Since plaintiff's participation in the program ended in 1970, we do not think that all the start-up costs would be allocated under the regulations to that short period, but we leave it to the trial

judge to ascertain how much. The Government should then show what portion of this amount has been paid already. If the trial judge finds that a balance is still due plaintiff he should award plaintiff that sum, but he should not permit plaintiff to recover twice for the same costs even though they may appear to qualify for reimbursement under more than one category.

The board next sustained the intermediary's disallowance of 35 percent of plaintiff's costs of obtaining drugs and pharmaceutical supplies. The intermediary determined that plaintiff's costs were that much higher than the prices indicated for such items in several surveys of the nationwide pharmaceutical market. Plaintiff, on the other hand, contends that prices in the Boston area did not vary as much as the intermediary supposed, that its own prices were within the range of prices reasonable in Boston, and that whatever premium it might have paid was justified by the fact that it required extraordinary services from the pharmacy.

This is essentially a factual determination of reasonableness, over which our review is limited. The board explained how it arrived at its result, based on the evidence before it. The intermediary had relied on three national price surveys, which it presented to the board. Plaintiff's only witness, on the other hand, owned the pharmacy that was plaintiff's pharmaceutical supplier. This was a retail drugstore in downtown Boston, several miles from the provider's facility in Brighton. Brighton is a community within the city but on its periphery. While the board recognized that the witness' credentials were impressive, it was bound to notice also that his testimony might have been self-serving in this instance. That witness, also apparently declined the opportunity to submit corroborative written evidence. Altogether, the board was not arbitrary or capricious in giving the testimony little weight. Defendant's surveys are not entirely irrelevant to the inquiry, although we agree with the board in preferring that local price data had been developed. The board did not deny that plaintiff might have had to deal with a retailer open all the time, rather than a discount house. We stress that our holding does not establish that national price data will always be determinative of local market conditions. We conclude only that on this record, plaintiff did not sustain its burden of presenting evidence to support the reasonableness of its claim.

Plaintiff's next complaint, that it was illegally deprived of an allowance for a return on its equity capital, can be disposed of briefly and in similar fashion. Here, too, plaintiff has failed to carry the burden of presenting sufficient evidence to support its claim for reimbursement. The regulations that provide for such an allowance also specify that providers seeking reimbursements must provide adequate cost data to support their claims, 20 C.F.R. § 405.453. Plaintiff cannot shift the burden to defendant. Thus, plaintiff's excuse that it could not produce adequate cost data because defendant did not supply details of its audit is not well taken. Upon review of the record, we cannot deny that the board permissibly exercised its discretion in concluding that plaintiff had failed to carry its burden.

Plaintiff characterizes its last objection, too, as the board's departure from regulations but it seems that plaintiff merely disputes the board's factual finding that plaintiff's costs for routine medical services were unreasonable. At the core of this disagreement is plaintiff's continued attempt to claim reimbursement for costs attributable to those portions of its facilities not then available to patients. The board recognized that it was not unreasonable for a new provider of services to suffer lower than average occupancy rates, which raises its per diem patient cost to some extent. But the board found that the intermediary already had increased plaintiff's allowance by an ample amount. Any further reimbursement, the board decided, would not serve the regulation's intent to prevent reimbursement of costs not attributable to patient care. These determinations will be before the Trial Division under the remand of the start-up costs issue.

Accordingly, with respect to each count except that involving plaintiff's reimbursement for overhead costs, defendant's motion for summary judgment is granted, and plaintiff's motion for summary judgment denied and its petition dismissed. The issue of allocation of overhead at the start, or start-up costs, is remanded for findings and computation of the amount due plaintiff, consistent with this opinion, under Rule 131(c).