The FAULKNER HOSPITAL
CORPORATION, Plaintiff,

v.

Richard S. SCHWEIKER, Secretary of
Health and Human Services,
Defendant.

Civ. A. No. 80–319–G.

United States District Court,
D. Massachusetts.

April 28, 1982.
As Amended May 13, 1982.

Thomas F. Maffei, Jeffrey L. Heidt, John A. Nadas, Choate, Hall & Stewart, Boston, Mass., for plaintiff.

Donald R. Anderson, Asst. U. S. Atty., Boston, Mass., for defendant.

## OPINION

GARRITY, District Judge.

This case is before the court on crossmotions for summary judgment. Plaintiff, The Faulkner Hospital Corporation ("Faulkner"), owns and operates a nonprofit general community hospital in Jamaica Plain, a section of Boston, Massachusetts, and is an approved provider of hospital services under Title XVIII of the Social Security Act, 42 U.S.C.A. § 1395 *et seq.* ("Medicare program"). Defendant is the U.S. Secretary of Health and Human Services, who is responsible for the administration of the Medicare program. In this action, plaintiff challenges a final decision by the Provider Reimbursement Review Board of the Department of Health and Human Services ("PRRB") denying reimbursement under the Medicare program for certain costs incurred by the plaintiff in fiscal year 1976. Specifically, Faulkner challenges the denial of reimbursement of unrecovered advances it made to a related hospital between 1973 and 1976 in order to comply with conditions imposed upon it in a certificate of need for the replacement and expansion of its own facility by the Massachusetts Department of Public Health ("DPH"). Our jurisdiction is based on 42 U.S.C. § 1395oo(f)(1).

### I.  *Factual and Procedural Background*

The undisputed facts of this case, which come from a joint stipulation entered into by the parties below, are as follows.[1]  Between 1903 and 1976, Faulkner maintained a 186-bed hospital. In 1966, it began to plan for the replacement and expansion of its outdated facility. On November 15, 1971, however, Massachusetts enacted its first health care facility determination-of-need law, Mass.G.L. c. 111, §§ 25C *et seq.* This law provides, in relevant part, that "no person ... shall make substantial capital expenditures for construction of a health care facility or substantially change the services of such a facility unless there is a determination of need by the [DPH] that there is a need therefor." G.L. c. 111, § 25C. The new building planned by Faulkner was not under construction on the date of the law's enactment, and hence Faulkner was required to submit an application for a certificate of need.

On March 30, 1972, Faulkner submitted to the DPH an application for a determination of need for the construction of a new

---

1. The parties' joint stipulation appears in its entirety at pages 160–172 of the administrative record.

hospital containing 240 medical-surgical beds (an increase of 54 beds over its then existing medical-surgical bed complement), 15 psychiatric beds and 40 extended care beds. Faulkner did not seek permission, nor did it then intend or desire to acquire another health care facility as part of its construction plans.

The staff of the DPH's determination-of-need program analyzed the Provider's application and concluded that replacement of the 186-bed facility was justified, but that expansion of the facility from 186 to 240 beds should be conditioned on "the Faulkner Hospital consummating plans for the consolidation of hospital beds in the community, the net effect of which is to bring about a significant reduction of total medical-surgical beds in the primary service area of the Faulkner Hospital . . . ." (R. p. 384).

On June 13 and July 11, 1972, the Public Health Council, the administrative body within the DPH empowered to determine need under Massachusetts' certificate-of-need law, determined a need for the *replacement* of Faulkner's 186-bed facility, but conditioned approval of its *expansion* from 186 to 240 medical-surgical beds on:

1. Faulkner's purchase of the Roslindale General Hospital (a/k/a "Doctors Hospital"), a 115 bed proprietary short-term Medicare participating hospital located in Faulkner's primary service area;

2. Faulkner's permanent termination of all inpatient services at Doctors Hospital prior to approval of a license for the additional 54 beds in its new facility; and

3. Faulkner's development of plans with consumer representatives and state and regional comprehensive health planning agencies for the future use of the Doctors Hospital facility.

The Public Health Council's approval of Faulkner's application for a certificate of need was appealed by a taxpayer group.

This appeal led to the imposition of a further condition to approval of the project. As stated in a letter dated April 6, 1973 from the DPH Council to the Provider, the determination of need was "subject to the additional condition that at least twenty-four (24) medical-surgical beds continue to be provided for the treatment of alcoholic patients." (R. p. 390).

In 1972, Faulkner purchased from Roslindale General Hospital, Inc. all of the assets (except accounts receivable) of Doctors Hospital for $701,500. It took over the operation of Doctors Hospital as of October 1, 1972, the beginning of the Provider's 1973 fiscal year. Faulkner organized the Faulkner Health Care Corporation ("FHCC") to own and operate the former Doctors Hospital. From February 13, 1973 until March 16, 1976, FHCC operated the facility and, through FHCC, Faulkner complied with the conditions set forth in its certificate of need for replacement and expansion of its facility. Because Doctors Hospital's operations were being gradually phased out, FHCC incurred high operating deficits during this period.

Faulkner was obligated to sustain the operations of FHCC in order to fulfill the conditions of its certificate of need. Hence, it advanced a total of $1,241,000 to FHCC to cover its deficits. Faulkner treated the advances as capital expenditures incurred in setting up its new facility.[2]

On March 16, 1976, inpatient services at FHCC were terminated and FHCC was merged into Faulkner. The provider opened the first 186 beds in its new building in May of the same year. By September 30, 1976, all 230 beds in the facility were in operation; however, Faulkner still had not recovered its advances to FHCC.

Faulkner added the amount of its unrecovered advances to the cost basis of its new facility and began to amortize this cost in 1976 over the 60-year useful life of the new building at an annual charge of $31,-

**2.** Beginning in 1973 Faulkner consistently reported its loans to FHCC as costs associated with its construction program. In its audited financial statements for each of fiscal years 1973 through 1975, the advances appear in the asset column of the balance sheet under the heading of "Building Fund" (R. p. 170--171).

025.[3] Blue Cross of Massachusetts, Inc. ("Blue Cross"), the Secretary's fiscal intermediary, audited Faulkner's cost reports for fiscal year 1976 and notified plaintiff on January 4, 1978 that it had made numerous adjustments in them. Faulkner requested a hearing before the PRRB on 18 of the intermediary's adjustments.[4] During the pendency of that proceeding, the plaintiff and Blue Cross were able to settle all of the contested audit adjustments except the intermediary's denial of reimbursement to Faulkner for its advances to FHCC. The PRRB held a hearing on this issue on October 24, 1979.

At the PRRB hearing, Faulkner took the position that the total amount of its unrecovered advances to FHCC was an element of the cost of constructing its new facility for which it was entitled to a depreciation allowance under 42 C.F.R. § 405.415. Specifically, it contended that the losses incurred by FHCC during the phase-out of operations at Doctors were extraordinary and the necessary consequence of the conditions imposed by Faulkner's certificate of need. Faulkner claimed that since it was legally obligated to fund the operating losses at Doctors until construction of its new facility was completed, and since capitalization of its advances was appropriate under generally accepted accounting principles, capitalization was likewise appropriate under 42 C.F.R. § 405.415. The PRRB rejected plaintiff's position and affirmed the intermediary's denial of reimbursement. In a 2–1 decision, dated December 19, 1979, it held that the cost could not be capitalized because it was not a "necessary and proper" cost of rendering care to patients at Faulkner within the meaning of 42 C.F.R. § 405.-451. Faulkner now appeals from that decision.[5]

## II. Relevant Statutory Background

As a provider of health care services to Medicare patients, Faulkner is entitled to reimbursement from Medicare for the reasonable cost of any service actually rendered by it. Section 1861(v)(1)(A) of Title 42, in relevant part, provides:

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services. 42 U.S.C. § 1395x(v)(1)(A).

Under the same section, the Secretary is authorized to establish, by regulation, methods with which to determine reasonable cost and the items to be included in such a determination. The regulations must take into account:

> ... both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined to be unnecessary in the efficient delivery of services covered by the insurance programs ...) in order that under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] ... will not be borne by individuals not so covered and the costs with respect to individuals not so covered will not be borne by [Medicare] ... 42 U.S.C. § 1395x(v)(1)(A).

42 C.F.R. § 405.451, the regulation relied on by the Secretary to deny reimbursement in this case, is the Secretary's own elaboration of the meaning of the term "reasonable cost" as used in 42 U.S.C. § 1395x(v)(1)(A).

---

**3.** For fiscal year 1976, the amount of the amortization for the four months after the opening of Faulkner's new facility was $10,538. (R. p. 15).

**4.** The Medicare Act provides for a complex administrative review scheme. Where, as in this case, the amount in controversy is more than $10,000, the PRRB has initial jurisdiction to hear the case. 42 U.S.C. § 1395oo(a). The PRRB consists of five members appointed by the Secretary. 42 U.S.C. § 1395oo(h). All five must be expert in the area of cost reimbursement; at least one must be a certified public accountant. Id. All PRRB decisions become final agency decisions unless reversed or modified by the Secretary within sixty days. 42 U.S.C. § 1395oo(f)(1).

**5.** The Secretary declined to reverse, affirm, or modify the Board's decision on February 14, 1980, thereby rendering it a final agency decision subject to this court's review. 42 U.S.C. § 1395oo(f)(1).

Subsection a of the regulation, in relevant part, states that:

> All payments to providers of services must be based on the reasonable cost of services covered under [the Medicare Act] and related to the care of beneficiaries. Reasonable cost includes *all necessary and proper costs* incurred in rendering the services, subject to principles relating to specific items of revenue and cost . . . .

42 C.F.R. § 405.451(a) (emphasis added). Subsection b of § 405.451, in turn, defines "necessary and proper costs" as "costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 405.451(b).

The regulation relied on by plaintiff, 42 C.F.R. § 405.415, establishes that an appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost under the Medicare program. It requires such depreciation to be:

(1) Identifiable and recorded in the provider's accounting records;

(2) Based on the historical cost of the asset . . . and

(3) Prorated over the useful life of the asset . . . 42 C.F.R. § 405.415.

"Historical cost" is defined by the regulation as the "cost incurred by the present owner in acquiring the asset." · 42 C.F.R. § 405.415(b)(1). For depreciable assets acquired after July 31, 1970, historical cost cannot exceed the lower or current reproduction cost adjusted for straight-line depreciation over the life of an asset to the time of its purchase or fair market value at the time of its purchase. 42 C.F.R. § 405.-415(b)(1).

Under § 405.415, a provider is entitled to a depreciation allowance not only for the cost of brick and mortar items but also for a variety of other direct and indirect capital costs related to the rendering of care to Medicare patients.[6] As the Medicare Provider Reimbursement Manual[7] explains:

> Historical cost is the cost incurred in acquiring the asset and to prepare it for use. Generally such cost includes costs that would be capitalized under generally accepted accounting principles. For example, in addition to the purchase price, historical cost would include architectural fees, consulting fees and related legal fees. . . . Prov.Reimb.Man., Part 1, § 104.10, reported at ¶ 4660, p. 1639–3, CCH Medicare and Medicaid Guide, Vol. I.

### III.  *Opinion*

Judicial review of actions brought under 42 U.S.C. § 1395oo(f)(1) is governed by the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Thus, the issue in this appeal is whether the PRRB's decision, that the sum of Faulkner's advances to Doctors Hospital was not a necessary and proper cost of rendering patient care services at Faulkner, was: (1) arbitrary or capricious; (2) an abuse of discretion or otherwise not in accordance with law; or (3) unsupported by substantial evidence. 5 U.S.C. § 706(2)(A) and (E); *Homan & Crimen, Inc. v. Harris*, 5 Cir. 1980, 626 F.2d 1201, 1212; *Doctors Hospital, Inc. v. Califano*, D.C.D.C.1978, 459 F.Supp. 201, 205.

▮ In resolving this issue, we are mindful that for purposes of judicial review, "substantial evidence" means something less than the weight of the evidence. *Consolo v. Federal Maritime Commission*,

---

**6.** Some of the costs related to the construction of a new plant which Medicare recognizes as properly capitalizable include: planning costs (PRM, Part I, § 2154.1 *et seq.*); legal fees and architect fees (PRM, Part I, § 104.10); advertising costs in connection with obtaining bids for construction or renovation of a provider's facilities (PRM, Part I, § 2136.1); and start-up costs (PRM, Part I, § 2132).

**7.** The Medicare Provider Reimbursement Manual is published by the Secretary as a guide for providers to determine the "reasonable cost" of furnishing patient care services to Medicare beneficiaries.

1966, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131; *Doctors Hospital Inc. v. Califano, supra,* at p. 205. It amounts to such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached. *Consolo v. Federal Maritime Commission, supra* at p. 620, 86 S.Ct. at 1026; *Doctors Hospital Inc. v. Califano, supra* at p. 205. We may not substitute our own opinion for that of the agency charged with the responsibility of administering the Medicare Program simply because it is possible to draw a different conclusion from the same evidence. See *Doctors Hospital Inc. v. Califano, supra* at p. 205. Nor may we affirm the decision on the basis of *post hoc* rationalizations advanced by defense counsel. *Id.* Rather, we must look solely at the PRRB's decision which itself must "be supported by substantial evidence when the record is viewed as a whole." 42 U.S.C. § 1359oo(d); *Doctors Hospital Inc. v. Califano, supra* at p. 205.

The PRRB based its decision that the sum of Faulkner's advances was not a "necessary and proper" cost on two grounds. First, the PRRB found that the cost was the operating deficit of Doctors Hospital and, as such, did not relate to the care of patients at Faulkner Hospital.[8] Second, it found that the cost was an uncommon cost which would not have been necessary if Faulkner had decided merely to replace, rather than to expand, its facilities.[9] After a hearing held on September 28, 1981, and

consideration of the parties' pre-hearing and post-hearing memoranda, we find that neither of these grounds is sufficient to support the PRRB's decision. Accordingly, we reverse that decision and remand this case to the Secretary for further proceedings not inconsistent with this opinion.

■ In our opinion, the PRRB's finding that the cost is not "necessary and proper" because it is uncommon and would not have been necessary had Faulkner decided merely to replace rather than to expand its facilities, is based on an erroneous interpretation of the Medicare statute and regulations. A cost which is actually incurred should not be disallowed merely because it is "not a common and accepted occurrence in the field of the provider's activities." 42 C.F.R. § 405.451(b)(2) provides that "necessary and proper costs" are *"usually* costs which are common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 405.451(b)(2) (emphasis added). We think the use of the word "usually" in the regulation plainly indicates that a claimed cost can be "necessary and proper" even if it is not a "common and accepted occurrence in the field of the provider's activity."[10] Our conclusion on this point is supported by the language of 42 C.F.R. § 405.451(c)(3) which, in pertinent part, states:

The reasonable cost basis of reimbursement contemplates that the providers of services would be reimbursed the actual

8. Relying heavily on a restatement of the language of the regulations, the PRRB summarily concluded:

The cost in question . . . is the operating deficit of Doctors Hospital from February 13, 1973 to March 16, 1976. *This deficit was not related to the care of patients in the Faulkner Hospital.* Both the Faulkner and Doctors filed separate cost reports during the period February 13, 1973 to March 16, 1976. Each was reimbursed its respective costs subject to the principles of reimbursement. Undoubtedly, the phasing out of Doctors Hospital produced additional costs because of the drop in its census. The transferring of these costs to the Faulkner Hospital would be improper. The deficit doesn't meet the requirements of 42 C.F.R. § 405.451. These costs are not deemed to be helpful in developing and maintaining patient care operations at

the Faulkner Hospital. Thus, the costs are not necessary and proper. Provider Reimbursement Review Board Hearing Decision # 79–D96, R. p. 21. (emphasis added).

9. The PRRB concluded:

Faulkner Hospital's expansion plans caused the Planning Agency to mandate the purchase of Doctors Hospital. Accordingly the Majority does not view the costs in question in this issue to be common and accepted occurrences in the field of the Provider's activities. *Id.*, p. 22.

10. Faulkner contends that the reason that its cost in operating Doctors Hospital was not a "common and accepted occurrence" was because Faulkner was one of the first hospitals to whose capital expenditures the Massachusetts certificate-of-need law applied.

costs of providing quality care *however widely the actual costs may vary from provider to provider and from time to time for the same provider.* 42 C.F.R. § 405.451(c)(3) (emphasis added).

◼ Reimbursement likewise should not be denied merely because a cost is associated with the expansion of existing facilities. Some expansion-related costs are clearly allowable. *See, e.g., Doctors Hospital, Inc. v. Califano, supra* (the interest costs associated with the purchase of a certificate of need from another hospital in order to expand existing facilities were properly capitalized rather than expensed currently because they were related to patient care to be rendered in the future to Medicare beneficiaries at the expanded facility); *Overlook Nursing Home, Inc. v. United States*, Ct.Cl. 1977, 556 F.2d 500 (where provider was required by state certification authorities to expand gradually, that portion of provider's operating expenses not related to patient care at the operating level reached when the cost was incurred was nevertheless an indirect start-up cost of providing care to future patients of facility and hence, plaintiff was due reimbursement for that portion of such costs which was properly amortizable over the period it participated in the Medicare Program); *Rapides General Hospital v. Matthews*, D.La.1977, 435 F.Supp. 384 (the cost of fulfilling plaintiff's free care obligation to non-Medicare covered indigents, imposed as a condition of obtaining Hill-Burton Act loans to finance provider's expansion was a "necessary and proper cost" which was reimbursable under the Medicare Program), *vacated and remanded on other grounds*, 5 Cir. 1978, C.A. No. 77–3125 (unpub. order).

◼ Moreover, so long as Faulkner's expansion conferred a benefit on Medicare beneficiaries, we believe it is irrelevant that Faulkner was not coerced into buying Doctors Hospital, but did so voluntarily in order to meet a state-imposed condition of expansion. *Cf. Presbyterian Hospital of Dallas v. Harris*, 5 Cir. 1981, 638 F.2d 1381 (the cost of providing medical care to non-Medicare covered indigents, imposed as a condition of eligibility for low interest federal loans, was a reimbursable indirect cost of providing patient care because the loans inured to the benefit of Medicare beneficiaries, even though the provider could have declined to take the loans in the first instance), *cert. denied*, 1981, —— U.S. ——, 102 S.Ct. 476, 70 L.Ed.2d 248. *Accord, Johnson County Memorial Hospital v. Schweiker*, D.Ind. 1981, 527 F.Supp. 1134; *Metropolitan Medical Center v. Harris*, D.Minn.1981, 524 F.Supp. 630; PRRB Hearing Dec. No. 81–D80, August 26, 1981, reported in *CCH Medicare and Medicaid Guide*, ¶ 31,492. In our view, the cost claimed herein is closely analogous, at least insofar as Medicare reimbursement principles are concerned, to the cost allowed in *Presbyterian Hospital of Dallas, supra.*[11] Faulkner could have avoided the conditions imposed by the DPH on its expansion by deciding not to expand just as a provider who applies for a construction loan under the Hill-Burton Act may avoid the free care obligation that is a condition of obtaining such a loan by declining to

---

11. Apparently PRRB member Owens, one of the two who formed the majority denying reimbursement in this case, also saw striking similarities between the cost involved herein and the cost of complying with the Hill-Burton free care obligation, a cost which was not recognized as being properly reimbursable under the Medicare Program until after the PRRB reached its decision below. At the hearing held before the PRRB, the following exchange occurred between member Owens and Mr. Allen Reilly, Associate Director of Faulkner:

MR. OWENS: When you get down to hard cold negotiations, they said that if you want to build this place you have to take care of this place. Is that a simplistic assumption?

MR. REILLY: That was their view.

MR. OWENS: Now, this had nothing to do with the Medicare program. This is a planning—the other side of the Federal situation combined with the state. It has nothing to do with Medicare programs.

Do you see a similarity between this situation and the Hill-Burton uncompensated services requirement, that if you want some money that if you want some money you have to give so much away in free care?

MR. REILLY: In my opinion, it is a very strong similarity.

MR. OWENS: There seems to be a parallel there to me.

accept such a loan in the first instance. Once Faulkner decided to expand, however, it became legally obligated to comply with the conditions imposed on such expansion and to incur the cost associated therewith just as a provider who decides to accept Hill-Burton Act funds is legally obligated to incur the cost of providing free care to indigents. We find no principled basis for treating the two types of costs differently in determining whether they are "necessary and proper" within the meaning of 42 C.F.R. § 405.451.

■ The Secretary argues that the cost involved in this case was properly disallowed because Faulkner's expansion itself was unnecessary. He relies for this argument on a mere reference by the PRRB to statements made in a DPH staff summary on Faulkner's certificate of need which was submitted to the Public Health Council prior to the Council's decision on Faulkner's application.[12] The Secretary suggests that this reference should be read as a finding by the PRRB that Faulkner could have further reduced the need for beds in its service area by bringing the average length of stay of its patients more in line with the national average and that therefore its expansion was unnecessary.

We reject defendant's argument on two grounds. First, the PRRB's reference to the staff summary plainly appears to have been made to support its conclusions only that Faulkner Hospital's expansion plans caused the Public Health Council to mandate the purchase of Doctors Hospital and that the costs were not common and accepted occurrences in the field of the Provider's

activities. Neither the PRRB nor even the DPH staff, whose statements the PRRB noted, ever found that Faulkner could have actually reduced the average length of stay of its patients. Second, even if the PRRB had found that Faulkner's expansion was unnecessary, such a finding would have been improper. First, it would have been plainly inconsistent, as defendant candidly conceded at oral argument, with the allowance of other costs in this case which were also related to plaintiff's expansion. Second, we believe it was not within the agency's authority under the Medicare program to determine the need for the expansion involved in this particular case. That determination was properly made by the Public Health Council, which approved Faulkner's expansion upon certain conditions that the record indicates were intended to improve the quality of health care provided to all patients, Medicare and non-Medicare alike. The question for the PRRB's determination was not whether it was reasonable for Faulkner to expand, but rather, whether given that decision, the cost incurred in effecting such expansion was reasonable.

■ The PRRB's other finding, that the cost at issue did not relate to the rendering of patient care services at Faulkner Hospital, is simply not supported by substantial evidence. It is undisputed, as the PRRB found, that the funds advanced by Faulkner to FHCC were used to cover an operating deficit sustained at Doctors Hospital during the period of its phase-out. However, it does not necessarily follow that the deficit was not related to the care of patients at Faulkner or that Faulkner's advances were

12. The PRRB stated:

It would appear from the record that Faulkner could have replaced its 186-bed facility with a new 186-bed facility without purchasing Doctors Hospital.

"2. In the absence of consolidation of hospital beds in the primary service area of the Faulkner Hospital there is no justification for expansion of inpatient medical-surgical services because:

(a) data supplied by the hospital shows that during the 1970–1980 decade the projected population of the primary service area will remain at about the same level.

(b) the average length of stay at the hospital is 11.7 days, which is 4 days above the national average. If the average length of stay were reduced 1 day at an occupancy rate of 90% only 161 beds would be needed."

(Recommended Action for the Determination of Need)

Thus, the advances that were caused to be made to Doctors Hospital to fund its deficit was motivated by the desire of The Faulkner Hospital to expand its existing 186-bed facility. (R. pp. 21-22)

not "appropriate and helpful in developing and maintaining the operation of patient care facilities and activities" at Faulkner. Indeed, all of the evidence presented below pointed to the opposite conclusions.

It was stipulated by the parties that Faulkner and FHCC, as separate providers in the Medicare Program between 1973 and 1976, were each entitled to a separate determination as to what constituted a reasonable cost for each of them and to separate reimbursement for their reasonable costs; that Faulkner was legally obligated under the terms of its certificate of need to sustain the operations of FHCC during the phase-out of Doctors Hospital in order to build its new facility; and that FHCC incurred at least some operating losses during the phase-out period which were directly attributable to constraints imposed on the operation of Doctors Hospital by its certificate of need.[13]

Furthermore, Faulkner submitted substantial unrebutted evidence that its compliance with the conditions of such certificate of need resulted in a consolidation and net reduction in the number of beds in the primary service area of Faulkner that the DPH and local health care planning agencies deemed necessary and beneficial; achieved in conservative terms, a net savings of over two million dollars in operating costs; and enabled the new and expanded Faulkner Hospital to operate in a bed range that maximizes economies of scale and generates sufficient volume to assure quality care.[14] Faulkner also presented substantial unrebutted evidence that the cost claimed herein was properly capitalized by the combined Faulkner-FHCC entity after 1976, rather than expensed currently by FHCC between 1973 and 1976, under generally accepted accounting principles.[15]

13. Prior to the PRRB hearing, the parties entered into a joint stipulation, abstracted by the PRRB in its decision, which *inter alia* stated:
1. For the five-year period prior to the takeover by Faulkner, Doctors Hospital operated at a profit.... Faulkner Hospital has also operated at a profit ....
2. In each fiscal year of the period from February 13, 1973 to March 16, 1976, FHCC incurred a significant operating deficit ....
3. In order to fulfill the conditions of its certificate of need, Faulkner Hospital was obligated to sustain the operations of FHCC. During fiscal years 1973 through 1976, Faulkner Hospital advanced funds in the aggregate amount of $1,241,000.00 to FHCC to cover FHCC's operating deficits....
4. The number of active staff at the Doctors Hospital fell off sharply after the Department granted the Provider a certificate of need conditioned on the purchase of Doctors Hospital and the elimination of its inpatient services.... With the reduced number of admitting physicians, occupancy rates declined .... The number of beds in operation was also reduced.
5. The certificate of need required the Provider to engage in a lengthy process of joint planning with consumer and health planning agency representatives to determine the future use of the Doctors Hospital facility. These planning provisions were assumed by staff at FHCC. FHCC therefore incurred planning costs necessitated solely by the Provider's certificate of need.
6. The Provider could not shut down FHCC because the Provider was obligated to continuously operate 24 beds for alcoholic patients

which were not available at its existing facility. During the period from 1973 through May of 1976, the Faulkner Hospital operated at an average occupancy rate of 93.5%. During the period from 1973 through March of 1976, FHCC maintained a minimum licensed bed capacity of 48 beds.
7. The Provider was precluded from quickly substituting new ambulatory services at FHCC in place of inpatient care because it was required to involve consumer representatives and health planning agencies in the selection of these services. (R. pp. 13–14)

14. In his dissent, PRRB member Curl suggests that the disallowance of the cost claimed herein, in light of the overall benefits to the community resulting therefrom, perpetuates a fatal Catch-22 situation created by inconsistencies inherent in a health care planning law, P.L. 93–641, the National Health Planning and Resources Development Act of 1974, and a reimbursement law, P.L. 89–97, the Medicare Act. Although the cost arose prior to the enactment of P.L. 93–641, we believe the policy considerations underlying the statute are important ones and that therefore Mr. Curl's point is well taken. We do not consider the bearing of P.L. 93–641 on this case because the issue was not briefed by plaintiffs and, in our opinion, such consideration is unnecessary to our decision.

15. In addition to testimony on this issue, Faulkner submitted a letter dated June 21, 1978 from its independent auditors, Coopers & Lybrand, who advised:
We have concluded that the purchase of Doctors Hospital was therefore directly related to

The PRRB's conclusion, in the face of this evidence, that the cost did not relate to patient care services at Faulkner appears to be assumed rather than based on a thorough consideration of the peculiar facts of this case against the relevant statutory framework. The PRRB pointed to no regulation which specifically disallows the cost. Although it acknowledged that the phasing out of Doctors Hospital "[u]ndoubtedly . . . produced additional costs because of the drop in its census," it made no specific findings regarding the relationship between such additional costs and the provision of health care services to Medicare patients at Faulkner's new facility. Indeed, it is not clear from the decision whether the Board ever even considered plaintiff's evidence regarding the relationship between the cost and the efficient delivery of health care services at Faulkner's new, as opposed to its old, facility. The PRRB's statement that Faulkner and Doctors were each reimbursed their respective costs, on the basis of separately filed cost reports between February 1973 and March 1976, suggests that plaintiff may have inadequately conveyed to the PRRB the main thrust of its reimbursement claim and that the PRRB may have believed that Faulkner was seeking reimbursement on a current basis for a cost which it readily conceded that neither it nor FHCC could properly claim on a current basis.

The Secretary states that the cost of complying with the conditions of Faulkner's certificate of need does "not readily fit into any recognized category of costs described in the regulations." 42 C.F.R. §§ 405.401–405.487. Nevertheless, he asserts that even

if the cost is related to the care of future patients at Faulkner's new facility, it is still non-reimbursable. Specifically, he contends that, to the extent that the sum of Faulkner's advances inured to the benefit of two classes—the then-current Medicare patients at Doctors Hospital and future Medicare patients at Faulkner's new facility—it is a "dual nature expense" which is non-reimbursable under *Mercy Hospital and Medical Center v. Harris*, 9 Cir. 1980, 625 F.2d 905. We disagree.

█ The provider in *Mercy Hospital, supra*, sought reimbursement for the operating deficit of its outpatient clinic as an educational expense on the theory that the clinic was operated primarily as an educational facility for the hospital's residents and interns, even though the hospital billed all patients directly for the services provided to them.[16] In its accounting the provider first set off all patient payments and grants against the operating costs of the clinic; then added the resulting net deficit to the overall net costs of the educational programs of the hospital; and finally reallocated those educational costs to the various inpatient departments whose patients are deemed to be the ultimate beneficiaries of the enhanced skills of the interns and residents who participate in the educational programs. *Mercy Hospital, supra*, p. 907–908. The Secretary disallowed the cost. The district court later affirmed the Secretary's decision on two grounds: (1) an administrative interpretation of the Medicare regulations expressly provided that an educational activity which also involves a service to a patient shall be considered "usual patient care" rather than an educational

the construction of the new Faulkner Hospital facility. . . . Deferral on the balance sheet is the appropriate accounting treatment for the excess costs incurred at Faulkner Health Care Facility.
In essence, the purchase price for the Faulkner Health Care Corporation facility included the direct cost plus the commitment to fund the operating losses at that location until such time as the new facility was completed. This concept of commitments as part of a purchase price is clearly contemplated by Opinion No. 16 of the Accounting Principles Board-Business Combinations at paragraph

88i "other liabilities and commitments including unfavorable leases, contracts and commitments and plant closing expense incident to the acquisition. . . ."
It is a long standing principle of accounting that costs associated with a building program are properly capitalizable as plant. (R. p. 593 594).

16. A hospital's educational expenses are deemed to benefit all patients and therefore an appropriate part of those expenses is reimbursable under the Medicare program.

activity for purposes of calculating the appropriate amount of Medicare reimbursement and (2) the step-down method of accounting prescribed by the Medicare regulations and used by plaintiff did not permit any cost center with costs that could be traced to individual patients to reallocate those costs to any other patients when seeking reimbursement.

In a subsequent appeal, the Ninth Circuit rejected the district court's reasoning that simply because patients were treated in the outpatient clinic, the provider could never establish that the costs of operating its outpatient clinic were reasonable educational costs under the Medicare program. It decided that a proper interpretation of the administrative interpretation relied on by the Secretary "should allow a hospital to avoid the apparent bar to allocating such costs as educational costs upon a showing that the patient care activities involved are primarily dictated by the objective of an overriding educational program." *Id.*, p. 909. Nevertheless, the court affirmed the district court's grant of summary judgment to the Secretary on the ground that under the Medicare regulations the provider's own accounting or billing practice precluded it from reallocating the clinic's costs, which could be traced directly to the care of particular patients, as educational costs, regardless of whether the claimed cost was deemed primarily educational or not.

We think *Mercy Hospital* is distinguishable from the present case for two reasons. First, in this case unlike in *Mercy, supra,* neither the PRRB nor the Secretary has pointed to any specific administrative interpretation of the Medicare regulations or feature of the plaintiff's accounting method which specifically precludes reimbursement for the cost claimed herein.[17] Second, they have submitted no evidence that plaintiff is,

in fact, seeking double reimbursement for a single cost which has already been reimbursed either to Faulkner or FHCC. Indeed, we believe plaintiff's evidence supports the inference that during the phaseout of Doctors Hospital, FHCC, unlike the provider in *Mercy, supra,* incurred not one but two distinct types of costs, one which was directly traceable to the care of patients at Doctors Hospital, for which FHCC was reimbursed to the full extent to which it was entitled under the Medicare program, and another which was directly attributable to compliance with the conditions imposed by Faulkner's certificate of need and therefore inured to the benefit, not of patients at FHCC, but rather of those at Faulkner's new facility. *Cf. Overlook Nursing Home, Inc. v. United States,* Ct.Cl.1977, 556 F.2d 500.

In *Overlook, supra,* a provider was required under Massachusetts state certification procedures to phase in its operations gradually. As a result, plaintiff incurred operating expenses both from licensed facilities already serving patients as well as from unlicensed portions of its plant that were not yet open to patients. When plaintiff sought reimbursement of its operating expenses, the intermediary disallowed the portion of the costs not related to patient care at the operating level reached when the cost was incurred and the PRRB affirmed the intermediary's decision. On appeal, the Court of Claims reversed the PRRB's decision and held that the additional overhead costs of carrying idle capacity due to the gradual phasing in of the facility, as required by the state health planning agency, were reimbursable under the Medicare program not as part of the cost of providing current patient care, but as an indirect capital cost of providing future patient care.[18] Thus, the court held that

---

17. In this regard, we note that 42 C.F.R. § 405.451(c)(3) provides, in part, that:

   ... where the provider's operating costs include amounts not related to patient care, *specifically not reimbursable under the program,* or flowing from the provision of luxury items or services (that is, those items or services substantially in excess of or more

expensive than those generally considered necessary for the provision of needed health services), such amounts will not be allowable [as a reasonable cost]. 42 C.F.R. § 405.-451(c)(3) (emphasis added).

18. A hospital operating under normal conditions at normal capacity will include as a part of the cost of rendering services to all patients

plaintiff was due reimbursement for that portion of its start-up costs that had not already been subsumed in the intermediary's patient care reimbursement formula and was properly amortizable during the period of plaintiff's participation in the Medicare program. *Overlook Nursing Home, Inc. v. United States, supra* at p. 505–506.[19]

Faulkner asserts that the cost claimed in this case is the mirror image of the cost involved in *Overlook, supra.* It argues that during the phase-out of Doctors Hospital, FHCC incurred an empty bed cost similar to the one involved in *Overlook, supra,* which was not a part of the cost of rendering care to patients who still used the facility, but rather was properly charged as a capital expenditure to the future patients of Faulkner's new facility, for whom the expense was incurred. Plaintiff further asserts that although Medicare continued to reimburse FHCC on a current basis throughout the phase-out period, it did so on the basis that the hospital was operating as a going concern and experiencing only the ordinary cost of providing health care to its patients. Neither Faulkner nor FHCC ever received reimbursement for the extraordinary overhead costs it experienced as a direct result of its compliance with the conditions of its certificate of need.

The parties have cited and we are aware of no decision or regulation which specifically addresses the question of the reimbursability under the Medicare program of the peculiar type of cost involved in this case. Nevertheless, we believe plaintiff's argument is compelling. Plaintiff's uncon-

tradicted evidence before the PRRB supports the inference that like the provider in *Overlook, supra,* FHCC incurred not one, but two distinct types of costs during the period of Doctors' phase-out: (1) the routine or ordinary cost of providing health care to patients at Doctors Hospital and (2) the extraordinary overhead cost of maintaining a facility over a three-year period during which the hospital's medical staff and patient population were dwindling.

■ Furthermore, we can discern and the Secretary has pointed to no cogent basis for distinguishing between state-mandated start-up costs and state-mandated phase-out costs in determining whether such costs are "necessary and proper" under 42 C.F.R. § 405.451. Both costs derive from the same source and appear to be equally "appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 C.F.R. § 405.451(b).

This case is different from *Overlook, supra,* in that here there were two providers who financed an operating deficit, not one. However, we believe that this case's result should not turn on the separate corporate identities of Faulkner and FHCC alone or on the fact that they were separate providers for Medicare purposes during the phase-out. The record indicates that the state continued to hold Faulkner, rather than FHCC, responsible for compliance with the conditions of its certificate of need throughout the phase-out period. The defendant Secretary has presented no reason why Faulkner should be denied reimbursement for a cost which, by analogy to *Overlook,*

---

the incremental overhead cost of not being able to operate at full capacity all the time. This cost is properly chargeable to current patients. During a provider's start-up period, the provider will incur certain start-up costs, including administrative and nursing salaries, taxes, heat, gas, electricity and employee training costs, etc., which are incident to the start-up period. Since these start-up costs are related to patient care services rendered after the start-up period, they must be capitalized as deferred charges and amortized over a number of benefiting periods. Medicare Provider Reimbursement Manual, Part I, § 2132, reported in CCH Medicare and Medicaid Guide, 1956, ¶ 5962.

**19.** In a subsequent opinion, clarifying its original *Overlook* decision, *supra,* the Court of Claims expressly rejected an assertion by the Secretary that its opinion and the Provider Reimbursement Manual's start-up cost provisions, § 2132.1 *et seq.,* should be construed to apply only to costs incurred before the facility was opened to any patients. *Overlook Nursing Home, Inc. v. United States,* 652 F.2d 68, Ct.Cl. 1979, No. 188–72, reported in Medicare and Medicaid Guide, New Developments, (transfer binder) p. 9447 at ¶ 29,505.

*supra*, it not only would have been allowed but also would have been required to capitalize, had it run the former Doctors Hospital facility directly rather than through FHCC.

We conclude, therefore, that to the extent FHCC incurred extraordinary losses which were directly attributable to constraints imposed on its operations by Faulkner's certificate of need, covered by Faulkner's advances, and not previously reimbursed to either Faulkner or FHCC, such losses were indirect costs of providing care to Medicare patients at Faulkner's new facility under 42 U.S.C. § 1395x(v)(1)(A) and "necessary and proper costs" of Faulkner under 42 C.F.R. § 405.451. In its complaint and motion for summary judgment plaintiff Faulkner requests this court to order the Secretary to reimburse it an additional $10,-538. for fiscal year 1976, on the theory that this constitutes the Medicare program's share of four months of amortization of the sum of Faulkner's unrecovered advances to FHCC. We deny plaintiff's request, however, because we are unable, on the present record, to determine what amount of the extraordinary costs incurred by FHCC and financed by Faulkner was actually caused by the state-mandated phase-out nor the extent to which such amount is reasonably and properly capitalized under 42 C.F.R. § 405.415. Several factual issues which were not specifically considered by the PRRB remain to be resolved before such determinations can be made. These include:

1. What amount of the extraordinary operating losses incurred by FHCC and financed by Faulkner during the period of the phase-out was actually caused by compliance with the provisions of Faulkner's certificate of need?

2. Was the cost sustained by Faulkner in phasing out Doctors Hospital reasonable in amount?

3. Was any part of the extraordinary operating cost for which Faulkner now claims reimbursement taken into account in fixing FHCC's current rate of Medicare reimbursement during the period of the phase-out? [20]

4. Are Faulkner's "necessary and proper costs" of phasing out Doctors Hospital subject to a depreciation allowance under 42 C.F.R. § 405.415 as plaintiff's unrebutted evidence indicates? If so, would allocating them to the total cost of the new facility cause it to exceed cost limitations imposed by the regulation? [21]

The above issues may not be decided *de novo* by this court. Rather, they must be returned to the agency charged with the responsibility for administering the Medicare Act for an exercise of its proper discretion. As the Fifth Circuit has held:

> *De novo* determination of a factual question in a judicial review of an adjudicatory proceeding governed by the Administrative Procedure Act is authorized only if the agency fact finding procedures are inadequate. *Camp v. Pitts*, 1973, 411 U.S. 138, 141–42 [93 S.Ct. 1241, 1243–1244, 36 L.Ed.2d 106]; *Citizens to Preserve Overton Park v. Volpe*, 1971, 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136]. Otherwise the courts must allow the agency to decide the issue for itself. Where an error of law has been corrected by a reviewing court, and the only issues remaining in the case are questions which have not yet been considered by the administrative agency but are nevertheless within the agency's authority, the appropriate action is to remand to the agency, so that it may exercise its authority. *Presbyterian Hospital of Dallas v. Harris*, 5 Cir. 1981, 638 F.2d 1381, 1389.

---

**20.** At the hearing held before the PRRB, the Intermediary's Audit Supervisor, LeRoy Dinnen, testified that this case involves no claim that Faulkner has been previously reimbursed by Medicare for the cost it claims herein. (R. p. 103)

**21.** Under 42 C.F.R. § 405.415, the historical cost of an asset acquired after July 31, 1970 shall not exceed the lower of current reproduction cost adjusted for straightline depreciation over the life of the asset to the time of the purchase or fair market value at the time of the purchase. 42 C.F.R. § 405.415(b)(2).

Plaintiff has raised no claim that the PRRB's fact-finding procedures are inadequate. Accordingly, we reverse the PRRB's decision and remand this case to the defendant PRRB for further proceedings consistent with this opinion.[22]

22. On remand, the PRRB, with the assistance of the parties and on the basis of its own expertise, shall develop a method for segregating FHCC's ordinary operating costs from the extraordinary operating costs attributable to compliance with the conditions of Faulkner's certificate of need. Plaintiff presumably shall be entitled to a depreciation allowance for the latter costs to the extent that the PRRB determines that they are properly capitalized under 42 C.F.R. § 405.415 and were not previously subsumed in the reimbursement granted to FHCC during the period of the phase-out of Doctors Hospital.